**Slip Op. 13-**31

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**Before: Nicholas Tsoucalas, Senior Judge**

| | |
|---|---|
| GUANGDONG WIREKING HOUSEWARES & HARDWARE CO., LTD., | : |
| | : |
| Plaintiff, | : |
| | : |
| and | : |
| | : |
| BUREAU OF FAIR TRADE FOR IMPORTS & EXPORTS, MINISTRY OF COMMERCE, PEOPLE'S REPUBLIC OF CHINA, | : |
| | : Court No.: 09-00422 |
| Plaintiff-Intervenor, | : |
| | : |
| v. | : |
| | : |
| UNITED STATES, | : |
| | : |
| Defendant, | : |
| | : |
| and | : |
| | : |
| NASHVILLE WIRE PRODUCTS, <u>et al.</u>, | : |
| | : |
| Defendant-Intervenors. | : |
| | : |

<u>**OPINION and ORDER**</u>

**Held:** Plaintiff and plaintiff-intervenor's motion for judgment on the agency record is denied because Public Law 112-99 is constitutional and the Department of Commerce's determination is supported by substantial evidence and is otherwise in accord with the law.

Dated:

<u>Curtis, Mallet-Prevost, Colt & Mosle LLP</u>, (<u>William H. Barringer</u>, <u>Daniel L. Porter</u>, <u>James P. Durling</u>, <u>Matthew P. McCullough</u>, and <u>Ross Bidlingmaier</u>) for Guangdong Wireking Housewares & Hardware Co., Ltd., Plaintiff, and for Bureau of Fair Trade for Imports & Exports, Ministry of Commerce, People's Republic of China, Plaintiff-Intervenor.

<u>Stuart F. Delery</u>, Principal Deputy Assistant Attorney General;

Jeanne E. Davidson, Director, Franklin E. White, Jr., Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (Alexander V. Sverdlov); Office of the Chief Counsel for Import Administration, United States Department of Commerce, Daniel J. Calhoun, Of Counsel, for the United States, Defendant.

Kelley Drye & Warren, LLP, (Kathleen W. Cannon, Paul C. Rosenthal, Brooke M. Ringel, and David C. Smith) for Nashville Wire Products, Inc. and SSW Holdings Co., Inc., Defendant-Intervenors.

**TSOUCALAS, Senior Judge:** Plaintiff Guangdong Wireking Housewares & Hardware Co., Ltd. ("GWK") and plaintiff-intervenor Bureau of Fair Trade for Imports & Exports, Ministry of Commerce, People's Republic of China (collectively "Plaintiffs") challenge several aspects of the determination by the Department of Commerce ("Commerce") in Certain Kitchen Shelving and Racks from the People's Republic of China: Final Affirmative Countervailing Duty Determination, 74 Fed. Reg. 37,012 (July 27, 2009) ("Final Determination"). Plaintiffs also challenge the constitutionality of a new law amending sections 701 and 777A of the Tariff Act of 1930.[1] See Pub. L. No. 112-99, 126 Stat. 265-67 (2012) (the "new law"). Commerce and defendant-intervenors, Nashville Wire Products, Inc. and SSW Holdings Co., Inc., oppose Plaintiffs' motion. For the following reasons, the court finds that the new law is constitutional and that the Final Determination is supported by substantial evidence and is otherwise in accord with the law.

---

[1] All further citations to the Tariff Act of 1930 are to the relevant provisions of Title 19 of the U.S. Code, 2006 edition, unless otherwise specified.

**Background**

**I. Procedural History**

On August 26, 2008 Commerce initiated a countervailing duty ("CVD") investigation on certain kitchen appliance shelving and racks ("KASR") imported from the People's Republic of China ("PRC") during the calendar year of 2007. See Notice of Initiation of CVD Investigation: Certain KASR from the PRC, 73 Fed. Reg. 50,304 (Aug. 26, 2008). Shortly thereafter, Commerce designated GWK as a "mandatory respondent" for the investigation. See Certain KASR From the PRC: Preliminary Affirmative CVD Determination and Alignment of Final CVD Determination with Final Antidumping Duty Determination, 74 Fed. Reg. 683, 683-684 (Jan. 7, 2009) (citing Memorandum to Stephen J. Claeys, "Respondent Selection Memo" (Sept. 17, 2008), Public Rec. 38)).[2]

Commerce also initiated a parallel antidumping duty ("AD") investigation covering KASR imported from the PRC between January 1, 2008 and June 30, 2008. Certain KASR from the PRC: Initiation of AD Investigation, 73 Fed. Reg. 50,596 (Aug. 27, 2008).[3]

---

[2]  Hereinafter all documents in the public record will be designated "P.R." without further specification except where relevant.

[3] In the AD investigation, Commerce utilized its non-market economy ("NME") methodology to calculate a weighted average dumping margin of 95.99% for GWK. See Certain KASR From the PRC: Final Determination of Sales at Less Than Fair Value, 74 Fed. Reg. 36,656, 36,661 (July 24, 2009). Under its NME methodology, Commerce determines normal value by valuing factors of production using surrogate data from a market economy "in an attempt to

On July 27, 2009, Commerce issued the final results of its CVD investigation. Final Determination, 74 Fed. Reg. at 37,012. Commerce made several findings relevant to the instant litigation. First, Commerce determined that it could impose CVDs on goods from the PRC despite the PRC's NME status in the AD investigation. See Issues and Decision Memorandum for the Final Determination in the CVD Investigation of Certain KASR from the PRC at 25–30, C-570-942 (July 20, 2009) ("I&D Memo"). Commerce also determined that GWK received a countervailable subsidy through the provision of wire rod by the government of China ("GOC") and State-Owned Enterprises ("SOEs") within the PRC at less than adequate remuneration ("LTAR"). See id. at 14–16. Commerce determined that market price for wire rod in the PRC was distorted by the GOC's substantial presence in the market and therefore used a "world average price" as a benchmark against which to measure the adequacy of remuneration. Id. at 15. Commerce assigned GWK a "Net Subsidy Rate" of 13.30%. See Final Determination, 74 Fed. Reg. at 37,014.

Plaintiffs allege that Commerce made several errors in the Final Determination. Specifically, Plaintiffs argue that (1) Commerce's policy of imposing CVDs on goods from NME countries is contrary to 19 U.S.C. § 1671(a); (2) Commerce's policy of imposing CVDs on goods from NME countries is unreasonable even if 19 U.S.C.

---

construct a hypothetical market value of that product." Nation Ford Chem. Co. v. United States, 166 F.3d 1373, 1375 (Fed. Cir. 1999).

§ 1671(a) is ambiguous; (3) Commerce erred in finding that certain of GWK's wire rod suppliers that are majority-owned by the GOC are "authorities" under 19 U.S.C. § 1677(5)(B); (4) Commerce erred in finding that certain of GWK's wire rod suppliers that are minority-owned by the GOC are "authorities" under 19 U.S.C. § 1677(5)(B); (5) Commerce erroneously countervailed GWK's wire rod purchases from privately-owned trading companies without first determining that GWK received a financial contribution; and (6) Commerce erroneously discarded in-country benchmarks for the price of wire rod based on the GOC's presence in the wire rod market. Pl. & Pl.-Intervenor's Br. Supp. Mot. J. Agency R. at 1–4 ("Pls.' Br.").

## II. <u>GPX</u> and the New Law

Parallel to the instant case, GPX International Tire Corp., an importer of tires from the PRC, challenged Commerce's policy of imposing CVDs on goods from NME countries. <u>GPX Int'l Tire Corp. v. United States</u>, 33 CIT __, __, 645 F. Supp. 2d 1231, 1239 (2009). Prior to 2007, Commerce refrained from imposing CVDs on goods from NME countries, as it could not identify and measure the effects of government subsidies in a centralized economy. <u>See</u> <u>Carbon Steel Wire Rod from Czechoslovakia: Final Negative CVD Determination</u>, 49 Fed. Reg. 19,370, 19,372–73 (May 7, 1984). The Court of Appeals for the Federal Circuit ("CAFC") upheld this policy as a reasonable interpretation of CVD law. <u>See</u> <u>Georgetown Steel Corp. v. United States</u>, 801 F.2d 1308, 1309 (Fed. Cir. 1986). However, in 2006,

Commerce announced that it was reconsidering the PRC's status as a NME country. See AD Investigation of Certain Lined Paper Products from the PRC - China's status as a NME, A-570-901 (Aug. 30, 2006) ("CLPP from the PRC"). Although it did not alter China's NME status, id. at 82, Commerce subsequently determined that it could identify and measure the effects of subsidies in the PRC, see CVD Investigation of Coated Free Sheet Paper from the PRC - Whether the Analytical Elements of the Georgetown Steel Opinion are Applicable to China's Present-Day Economy at 10, C-570-907 (Mar. 29, 2007) ("CFSP from the PRC"), and therefore began imposing CVDs on goods from the PRC. See Coated Free Sheet Paper from the PRC: Final Affirmative CVD Determination, 72 Fed. Reg. 60,645 (Oct. 25, 2007).

In 2011, the CAFC found that "in amending and reenacting the trade laws in 1988 and 1994, Congress adopted the position that [CVD] law does not apply to NME countries." GPX Int'l Tire Corp. v. United States, 666 F.3d 732, 745 (Fed. Cir. 2011) ("GPX II"). Therefore, the CAFC concluded that "[CVDs] cannot be applied to goods from NME countries." Id.

Before the CAFC's mandate was issued in GPX II, Congress enacted the new law. See 126 Stat. at 265–67. The new law has two sections. Id. Section 1 of the new law directs Commerce to impose CVDs on goods from NME countries except where Commerce is "unable to identify and measure subsidies provided by the government of the [NME] country or a public entity within the territory of the [NME]

country because the economy of that country is essentially comprised of a single entity." § 1(a), 126 Stat. at 265. Section 1 applies to all proceedings initiated by Commerce on or after November 20, 2006. § 1(b), 126 Stat. at 265. Section 2, which applies only to proceedings initiated following the enactment of the new law, directs Commerce to "reduce" the AD in all proceedings involving the concurrent imposition of CVDs and ADs where it can "reasonably estimate the extent to which the countervailable subsidy . . . increased the weighted average dumping margin" for subject merchandise. § 2, 126 Stat. at 266.

Following the passage of the new law, the CAFC requested additional briefing concerning the impact of the new law on Commerce's petition for rehearing GPX II. See GPX Int'l Tire Corp. v. United States, 678 F.3d 1308, 1311 (Fed. Cir. 2012) ("GPX III"). In assessing the impact of new law, the CAFC concluded that by enacting section 1 "Congress clearly sought to overrule" the holding in GPX II. Id. at 1311. It also noted that section 2 changed CVD law prospectively, as the former law did not include protection against potential double-counting of remedies. Id. at 1311–12. The CAFC remanded so that this Court could evaluate the constitutional claims GPX raised for the first time in its opposition to the petition for rehearing. See id. at 1312–13.

On remand, GPX argued that the new law was a retroactive change to CVD law which "violate[d] the Ex Post Facto Clause of the

Constitution, as well as due process and equal protection rights of the Fifth Amendment." See GPX Int'l Tire Corp. v. United States, 37 CIT __, __, Slip Op. 13-2 at 8 (Jan. 7, 2013) ("GPX IV").[4] This Court did not rule on whether the new law retroactively changed CVD law, id. at __, Slip Op. 13-2 at 14, but found that the new law was nonetheless constitutional even assuming that it did make a retroactive change. See id. at __, Slip Op. 13-2 at 14–31.

During the course of the GPX litigation, parties to the instant case submitted supplemental briefs concerning the constitutionality of the new law. Plaintiffs contend that section 1(b) of new law retroactively changes the CVD statute and violates the Ex Post Facto Clause, as well as the Fifth Amendment guarantees of due process and equal protection. See Pl. & Pl.-Intervenor's Supplemental Br. Supp. Mot. J. Agency R. at 1 ("Pls.' Supplemental Br."). Plaintiffs ask the court to sever section 1(b) of the new law "to preserve the broader legislation." Id. at 38.

### JURISDICTION and STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c). The court will uphold Commerce's final determination in a CVD

---

[4] Although GPX IV was decided after the completion of supplemental briefing in this case, Commerce submitted it as supplemental authority. See Def.'s Notice of Supplemental Authority, Dkt. No. 93 (Jan. 11, 2013). All parties referenced the decision throughout the oral argument before the court. See generally, Oral Argument, Guangdong Wireking Housewares & Hardware Co. v. United States, Court No. 09-00422 (Ct. Int'l Trade Jan. 16, 2013) ("Oral Arg.").

investigation unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

Constitutional challenges are subject to a de novo review. NationsBank of Tex., N.A. v. United States, 269 F.3d 1332, 1335 (Fed. Cir. 2001). Due process claims concerning economic legislation come before the court with a "presumption of constitutionality," and "the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way." Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal., 508 U.S. 602, 637 (1993). With regard to equal protection challenges, where neither a fundamental right nor suspect class is at issue the legislation will be upheld "if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." Heller v. Doe, 509 U.S. 312, 320 (1993).

## DISCUSSION

Plaintiffs argue that the court should remand the Final Determination because the new law is unconstitutional and because several of Commerce's findings are not based on substantial evidence or are not otherwise in accord with the law.

### I. Constitutional Issues

#### A. Retroactive Application of the New Law

As a preliminary matter, the parties dispute whether section

1 of the new law retroactively changes CVD law, as it directs Commerce to impose CVDs on goods from NME countries in all proceedings initiated on or after November 20, 2006. See § 1, 126 Stat. at 265. Plaintiffs allege that section 1 retroactively changes CVD law, which unambiguously prohibited the imposition of CVDs on goods from NME countries prior to the enactment of the new law. Pl. & Pl.-Intervenor's Reply Br. Concerning Const. Issues at 2–5 ("Pls.' Supplemental Reply"). Commerce argues that section 1 does not make a retroactive change to CVD law, but rather "clarif[ies]" the law as it was before GPX II. Def.'s Resp. Pls.' Supplemental Br. at 6–10 ("Def.'s Supplemental Br."). Even if the new law is a retroactive change as Plaintiffs contend, the court need not decide this issue because, for the reasons articulated below, Plaintiffs fail to demonstrate that section 1 is unconstitutional.

### B. Ex Post Facto Clause

The Ex Post Facto Clause states that "No Bill of Attainder or ex post facto Law shall be passed." U.S. Const. art. I, § 9, cl. 3. An ex post facto law is a law that "renders an act punishable in a manner in which it was not punishable when it was committed," Fletcher v. Peck, 10 U.S. 87, 138 (1810), or "inflicts a greater punishment, than the law annexed to the crime, when committed." Calder v. Bull, 3 U.S. 386, 390 (1798). While the Ex Post Facto Clause does not prohibit all retroactive laws, it "flatly prohibits

retroactive application of penal legislation." Landgraf v. USI Film Prods., 511 U.S. 244, 266 (1994). "Penal legislation" often refers to criminal laws, but certain non-criminal retroactive laws are penal in nature and are thus subject to the prohibition of ex post facto laws. See, e.g., Burgess v. Salmon, 97 U.S. 381, 384 (1878); Cummings v. Missouri, 71 U.S. 277, 329 (1866).

To demonstrate that a civil law is penal in nature, the challenger must show by the "clearest proof" that the law is "so punitive either in purpose or effect as to negate the State's intention to deem it civil." Smith v. Doe, 538 U.S. 84, 92 (2003) (internal citations and brackets omitted). In determining whether a law is penal in nature, courts consider a three-prong test:

> A statute imposes a penalty only when: (1) the costs imposed are unrelated to the amount of actual harm suffered and are related more to the penalized party's conduct, (2) the proceeds from infractions are collected by the state, rather than paid to the individual harmed, and (3) the statute is meant to address a harm to the public, as opposed to remedying a harm to an individual.

Huaiyin Foreign Trade Corp. (30) v. United States, 322 F.3d 1369, 1380 (Fed. Cir. 2003) (citing Ingalls Shipbuilding, Inc. v. Dalton, 119 F.3d 972, 978 (Fed. Cir. 1997)). The party challenging the law must demonstrate that the law satisfies all three prongs of the Huaiyin test. Id. Plaintiffs fail to meet this burden.

It is well established that trade duties are remedial, not punitive. See Chaparral Steel Co. v. United States, 901 F.2d 1097, 1103-04 (Fed. Cir. 1990); Peer Bearing Co. v. United States, 25 CIT

1199, 1221, 182 F. Supp. 2d 1285, 1310 (2001); Badger-Powhatan v. United States, 9 CIT 213, 216, 608 F. Supp. 653, 656 (1985). The specific purpose of CVD law is to "offset" the harmful effects of foreign subsidies. See S. Rep. No. 1221, 92d Cong., 2d Sess. 8 (1972) (cited in Chaparral, 901 F.2d at 1103–04). The remedial purpose is reflected in the language of the CVD statute, which directs Commerce to calculate a CVD "equal to the amount of the net countervailable subsidy." 19 U.S.C. § 1671(a). In fact, this Court found that the CVDs imposed under section 1 were not penalties because "they remain mathematically linked to the measured harm." GPX IV, 37 CIT at __, Slip Op. 13-2 at 17.

However, Plaintiffs insist that the focus on the mathematical relationship between the subsidy and the CVD in GPX IV is misplaced. Plaintiffs contend that the court's focus should be on the nature of the new law itself, specifically whether it imposes duties that exceed those Commerce imposed under the previous legal regime. See Oral Arg. at 18:01. According to Plaintiffs, the CVDs imposed under section 1 are disproportionate to the harm caused by the unfair pricing of goods imported from NME countries because they are imposed on top of the special NME AD, which was the "complete and exclusive remedy" for such unfair pricing under the old legal regime. Id. at 18:22. Plaintiffs insist that the new law is analogous to the retroactive tax increase struck down in Salmon, 97 U.S. at 384, which also retroactively imposed a greater

liability than the affected party was subject to at the time the cost was assessed.  See Oral Arg. at 21:00.

Plaintiffs' argument is unpersuasive because it misinterprets the first prong of the Huaiyin test.  Plaintiffs essentially argue that any retroactive increase in the costs assessed will be disproportionate to the harm.  That is simply not the case.  The test requires the party challenging the statute to demonstrate "the absence of an association between the costs imposed and the actual harm done."  Ingalls, 119 F.3d at 978 (citing Huntington v. Atrill, 146 U.S. 657, 676 (1892)).  Here, the imposition of CVDs under the new law is associated with the harm caused by subsidies.  ADs and CVDs are separate remedies that counteract different anticompetitive behaviors.  See 19 U.S.C. §§ 1671, 1673.  The imposition of one type of duty does not obviate the need for the other, nor does it address the harm caused by the conduct the other duty is designed to remedy.  Accordingly, CVDs are the proper remedy to address the harms caused by foreign subsidies.  Id. at 1671(a).[5]

---

[5] Plaintiffs also claim that the new law has "tainted" past ITC determinations because artificially high AD margins make a finding of injury to the domestic industry more likely.  Pls.' Supplemental Br. at 18 (citing 19 U.S.C. § 1677(7)(C)(iii)(V)). Dumping margin, however, is but one of a number of factors the ITC considers when making an injury determination.  See 19 U.S.C. § 1677(7)(C).  Moreover, a dumping margin does not in and of itself demonstrate injury to a domestic industry, but rather identifies differences in price between a respondent's home market and the U.S. market.  See 19 U.S.C. § 1677(35)(A).

Similarly, Plaintiffs fail to demonstrate that section 1 addresses a public rather than a private harm. Plaintiffs contend that the imposition of duplicative duties evidences Congress's intent to address public harms such as "the need to punish China . . . and address 'illegal' subsidies." Pls.' Supplemental Br. at 20. However, Plaintiffs' argument overlooks the fact that CVDs are imposed only where a domestic industry has been "materially injured" or "threatened with material injury" by foreign subsidies. 19 U.S.C. § 1671(a); see GPX IV, 37 CIT at __, Slip Op. 13-2 at 17 (noting that CVD are "collected to primarily counter the individual harm to particular domestic industries in an attempt to provide relief from the imports which are causing or threatening material injury"). Moreover, in their assessment of legislative intent, Plaintiffs overlook evidence indicating Congress's substantial interest in "leveling the playing field" for domestic industries. See generally, 158 Cong. Rec. H1166, H1166–73 (Mar. 6, 2012). As section 1 primarily addresses a private harm to individual domestic industries, the fact that it also addresses certain public harms does not render it penal in nature. Because they fail to demonstrate that the new law is "penal legislation," Plaintiffs cannot show that the new law violates the Ex Post Facto Clause.

## C. Due Process

Plaintiffs also argue that the new law violates the due process guarantees of the Fifth Amendment by retroactively impeding

importers' vested interests in the "finality and repose" of their transactions. See Pls.' Supplemental Br. at 28–33. Specifically, Plaintiffs argue that section 1 levies a "harsh and oppressive" retroactive tax which violates the prohibition against wholly new retroactive taxes, exceeds recognized limits on the retroactive application of tax legislation, and imposes excess duties upon importers that they reasonably believed they would not be liable for at the time they entered their goods. See id. at 30—33. Alternatively, Plaintiffs argue that even if it is considered general economic legislation, the new law still violates due process because section 1 does not achieve a legitimate government purpose. See id. at 33–35. In response, Commerce argues that the new law does not violate due process because it was enacted in order to correct an erroneous judicial decision and protect domestic industries. See Def.'s Supplemental Br. at 21–25. According to Commerce, the new law is general economic legislation rather than tax legislation, but is nonetheless constitutional as tax legislation because subjected importers like GWK had notice of and therefore could reasonably expect potential CVD liability. See id. at 26—30.

General economic legislation faces "a presumption of constitutionality" and is analyzed under a rational basis review. Pension Benefit Guar. Corp. v. R.A. Gray & Co., 467 U.S. 717, 729 (1984). "[T]he strong deference accorded legislation in the field

of national economic policy is no less applicable when that legislation is applied retroactively." Id. Thus, retroactive economic legislation will be upheld if the retroactive application "is itself justified by a rational legislative purpose." Id. at 730. With regard to retroactive tax legislation, courts have considered "whether 'retroactive application is so harsh and oppressive as to transgress the constitutional limitation.'" United States v. Carlton, 512 U.S. 26, 30 (1994) (quoting Welch v. Henry, 305 U.S. 134, 147 (1938)). The "harsh and oppressive" standard, however, "'does not differ from the prohibition against arbitrary and irrational legislation' that applies generally to enactments in the sphere of economic policy." Id. (quoting R.A. Gray, 467 U.S. at 733). Thus, whether the new law is considered tax legislation or general economic legislation, Plaintiffs must demonstrate that Congress acted in an irrational and arbitrary manner. See id. In determining whether a retroactive law passes a rational basis review, courts may consider "the reliance interests of the parties affected, whether the impairment of the private interest is effected in an area previously subjected to regulatory control, the equities of imposing the legislative burdens, and the inclusion of statutory provisions designed to limit and moderate the impact of the burdens." Nachman Corp. v. Pension Benefit Guar. Corp., 592 F.2d 947, 960 (7th Cir. 1979), aff'd 446 U.S. 359 (1980) (internal citations omitted).

On the reliance factor, Plaintiffs cite Justice O'Connor's concurring opinion in Carlton, which states that "[t]he governmental interest in revising the tax laws must at some point give way to the taxpayer's interest in finality and repose." 512 U.S. at 37–38 (O'Connor, J., concurring). According to Plaintiffs, importers like GWK reasonably relied on the unambiguous prohibition against the imposition of CVDs on goods from NME countries when they entered their goods. Pls.' Supplemental Br. at 32. Now, years later, section 1 retroactively imposes previously illegal CVDs, upsetting their interest in a rate without such CVDs. Id. Essentially, Plaintiffs argue that GWK's reliance interests were upset because GWK and other similarly situated importers would not have entered goods had they knowledge of the retroactive tax. Id.

However, Plaintiffs fail to identify a vested interest. See Carlton, 512 U.S. at 33 (holding that a party's detrimental reliance on a statute prior to retroactive change is insufficient to demonstrate a due process violation where there is no vested interest). GWK and similarly situated importers could not rely on a specific CVD-free duty assessment at the time of entry. See Norwegian Nitrogen Prods. Co. v. United States, 288 U.S. 294, 318 (1933) ("No one has a legal right to the maintenance of an existing rate or duty."). Moreover, importers who entered goods from NME countries during the retroactive period of section 1 were on notice of the PRC's shifting status and their own potential CVD liability

as early as 2006. See CLPP from the PRC at 1–4; CFSP from the PRC at 10. Additionally, Plaintiffs cannot have relied on the holding in GPX II to demonstrate their interest in a duty rate exclusive of CVDs because the CAFC never issued a mandate. See GPX III, 678 F.3d at 1312. As importers subject to section 1 did not have a vested right in duty assessments that excluded CVDs, Plaintiffs cannot show that section 1 interfered with such a right.

With regard to the second Nachman factor, Plaintiffs insist that the new law "retroactively introduces a wholly new tax" that violates the prohibition against such taxes recognized by the Supreme Court in Carlton. See Pls.' Supplemental Br. at 30–31. However, Plaintiffs' reliance on Carlton is misplaced. Section 1 is not a "wholly new" tax, it amends the operation of CVD law, applying it to goods imported from NME countries. See § 1, 126 Stat. at 265; see also GPX IV, 37 CIT at __, Slip Op. 13-2 at 26 ("Section 1 of the [new law] merely extends or expressly recognizes the ability of Commerce to impose CVDs in the NME context."). In Carlton, the Supreme Court specifically excluded such legislative acts from the prohibition of wholly new retroactive taxes, stating that the prohibition "'is of limited value in assessing the constitutionality of subsequent amendments that bring about certain changes in operation of the tax laws.'" Carlton, 512 U.S. at 34 (citing United States v. Hemme, 476 U.S. 558, 568 (1986)).

Plaintiffs also insist that the new law "retroactively,

without notice, grant[s] [Commerce] authority where none previously existed to impose [CVDs]." Pls.' Supplemental Br. at 25. However, as noted above, Commerce announced in 2006 that it was reconsidering the PRC's NME status, see CLPP from the PRC at 1–4, and shortly thereafter determined it could identify subsidies in the PRC. See CFSP from the PRC at 10. Whether Commerce's policy shift was consistent with CVD law at the time does not bear on the issue of whether GWK had notice of potential CVD liability. Therefore, GWK was aware of the regulatory control Commerce intended to exert over goods from NME countries before the enactment of the new law.

With regard to the balance of burdens, the court finds that the need to protect the domestic industry and to correct an unexpected judicial decision form a rational basis for the retroactive application of section 1. The Supreme Court has recognized that correcting an erroneous or unexpected interpretation of a statute is a legitimate purpose for enacting retroactive legislation. See Carlton, 512 U.S. at 32 (closing an unexpected loophole in an estate tax statute was a "legitimate legislative purpose" for a retroactive amendment to that statute); Gen. Motors Corp. v. Romein, 503 U.S. 181, 191 (1992) (upholding retroactive legislation that corrected the unexpected results of a judicial opinion). Congress's curative intent is demonstrated by the language of section 1, which essentially overturns GPX II. See

§ 1, 126 Stat. at 265; see also GPX III, 678 F.3d at 1311 ("Congress clearly sought to overrule our decision in [GPX II]."). The legislative history of the new law also evidences Congress's intent to overturn GPX II. See generally 158 Cong. Rec. at H1166–73.[6]

The retroactive period of section 1, although lengthy, is a rational means of achieving Congress's objectives. The Supreme Court upheld a retroactive period that stretched back multiple years where it was necessary to correct the unexpected results of a judicial decision. See Romein, 503 U.S. at 191. Here, a shorter retroactive period would have resulted in the possible termination of approximately twenty four CVD orders and investigations, harming domestic industries. See 158 Cong. Rec. at H1173. Furthermore, as this Court recognized in GPX IV, it was reasonable for Congress to "defer[] to Commerce's expertise in determining when Commerce first might have been able to identify and measure subsidies in the PRC." 37 CIT at __, Slip Op. 13-2 at 26. Accordingly, the court finds that the new law does not violate the due process guarantees of the Fifth Amendment.[7]

---

[6] Representative Camp stated that the new law "overturns an erroneous decision by the [CAFC]." 158 Cong. Rec. at H1167. Representative Rohrabacher stated that the new law "overturns a faulty court decision." Id. at H1168. Representative Critz stated that "[w]e must take action today and pass [the new law] to overturn a flawed court ruling." Id. at H1170.

[7] Plaintiffs also insist that the new law unduly burdens past importers without providing any protection to the domestic industry. See Pls.' Supplemental Br. at 33–35. According to

## C. Equal Protection

Finally, Plaintiffs argue that the new law violates the right to equal protection under the Fifth Amendment by creating an arbitrary distinction between importers subject to section 1 of the new law and importers subject to section 2. Pls.' Supplemental Br. at 35–37. The classification at issue arises from the different effective dates of the new law's two sections. Section 1 directs Commerce to impose CVDs on goods from NME countries in all proceedings initiated on or after November 20, 2006, with no protection from potential double counting of remedies. § 1, 126 Stat. at 265. Section 2, on the other hand, provides protection against double counting of remedies resulting from the concurrent imposition of ADs and CVDs, but only for those importers whose goods are subject to proceedings initiated after the enactment of the new law. § 2, 126 Stat. 265–66. Plaintiffs do not argue that the classification at issue involves a suspect class. Pls.'

---

Plaintiffs, the domestic industry is adequately protected from the effects of subsidies by the deposits on CVD orders importers paid in 2007. Id. at 34. As the new law does not provide any additional protection and merely imposes duplicative duties on past importers, Plaintiffs insist that it is not supported by a rational basis. Id. at 34–35. Plaintiffs add that the refund of those deposits would not harm the domestic industry because the importers receiving refunds would still be subject to "substantial" ADs. Id. at 35. However, this argument is inconsistent with trade law. First, ADs and CVDs are separate remedies that address different anticompetitive behaviors. See 19 U.S.C. §§ 1671, 1673. Second, Plaintiffs do not cite any authority for the proposition that a domestic industry is adequately protected by the payment of cash deposits which will be refunded in the future.

Supplemental Br. at 36.

"'[A] classification neither involving fundamental rights nor proceeding along suspect lines . . . cannot run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose.'" Armour v. City of Indianapolis, 132 S. Ct. 2073, 2080 (2012) (quoting Heller, 509 U.S. at 319–320). A court will uphold such a classification "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." FCC v. Beach Commc'ns, Inc., 508 U.S. 307, 313 (1993).

Plaintiffs insist that the new law violates equal protection because importers whose goods are subject to section 1 receive "much more harsh treatment" than those whose goods are subject to section 2. Pls.' Supplemental Reply at 12. According to Plaintiffs, section 2 provides a legislative fix against double counting and is thus consistent with Congress's intent to create a "level playing field" for the domestic industry. See Pls.' Supplemental Br. at 37. Because section 1 does not provide the same protection against potentially overlapping remedies, Plaintiffs contend that it "patently slanted the playing field against exporters and importers subject to CVD orders and investigations prior to passage of the [new law]." Id.

Commerce argues that administrative efficiency and finality justify the retroactive application of section 1. Def.'s

Supplemental Br. at 32–33.  Specifically, Commerce contends that the retroactive application of section 1 prevented Commerce from having to reopen "numerous [CVD] investigations and reviews that were initiated before the implementation of section 2."  Id. at 32. Additionally, Commerce argues that the retroactive application of section 2 would entail "tremendously complex undertakings that almost certainly require factual information and analytical tools not present on most earlier administrative records."  Id.  Commerce also notes that Congress did not need to apply section 2 retroactively because it was enacted in order to "implement an adverse WTO decision."  Id. at 33.  Because statutes enacted to give effect to WTO decisions are implemented prospectively, Commerce concludes that it was reasonable for Congress to decline to apply section 2 to past CVD investigations unnecessarily.  Id.

The court finds that Commerce proffers a legitimate rationale for Congress's decision to apply section 1 retroactively.  The Supreme Court has recognized that administrative efficiency and finality are legitimate legislative interests.  See Armour, 132 S. Ct. at 2081.  In Armour, the Supreme Court upheld a law that provided prospective relief to city residents who owed future installment payments while denying refunds to those residents who paid in full because such refunds would require the expenditure of considerable administrative resources.  Id.  The instant case involves similar legislative interests, as the retroactive application of section 2 would require Commerce to recalculate AD

margins for numerous completed CVD investigations and orders.[8]
Moreover, the decision to apply section 2 prospectively only is
consistent with Congress's obligations when implementing adverse
WTO decisions.  See 19 U.S.C. § 3538.  Accordingly, the court finds
that the new law is supported by a rational basis and therefore
does not violate equal protection rights under the Fifth Amendment.

### E. Severability

Because the court finds that section 1 law is constitutional,
it need not reach a decision on the issue of severability.

### II. CVD Determination

As the new law is constitutional, the court must now address
the claims Plaintiffs raise in their original brief challenging
certain aspects of the Final Determination, specifically: (1)
whether Commerce erred in treating GWK's suppliers of wire rod that
were majority-owned by the GOC as "authorities" under 19 U.S.C. §
1677(5)(B); (2) whether Commerce erred in treating GWK's suppliers
of wire rod that were minority-owned by the GOC as "authorities"
under 19 U.S.C. § 1677(5)(B); (3) whether Commerce erroneously
countervailed wire rod provided to GWK by privately-owned trading
companies; and (4) whether Commerce erroneously discarded in-

---

[8] Plaintiffs insist that the burden of recalculating ADs is
insubstantial compared to the administrative burden the city of
Indianapolis faced in Armour.  See Pls.' Supplemental Reply at 13.
However, the relative burden is irrelevant.  As this Court
recognized in GPX IV, "at least some significant effort would be
required to apply [Section 2] methodology to this case and other
completed investigations."  37 CIT at __, Slip Op. 13-2 at 31.

country benchmarks for the price of wire rod.  See Pls.' Br. at 5.[9]

### A. "Authority" Status of GWK's Wire Rod Suppliers

A subsidy occurs when "an authority provides a financial contribution . . . to a person and a benefit is thereby conferred." 19 U.S.C. § 1677(5)(B).  The statute defines "authority" as "a government of a country or any public entity within the territory of the country."  Id.  Commerce treats entities that are owned by a government as "authorities."  Countervailing Duties; Final Rule, 63 Fed. Reg. 65,348, 65,402 (Nov. 25, 1998) ("CVD Final Rule"). However, "where it [is] unclear whether a firm [is] an authority based on ownership information alone," Commerce consults five relevant factors: "(1) government ownership; (2) the government's presence on the entity's board of directors; (3) the government's control over the entity's activities; (4) the entity's pursuit of governmental policies or interests; and (5) whether the entity is created by statute."  I&D Memo at 43.

### 1. Wire Rod Suppliers Majority-Owned by the GOC

Commerce determined that the GOC held "a majority ownership position in certain of the wire rod producers that supply [GWK]," and thus "treat[ed] these producers as 'authorities'" during the investigation.  Id. at 44; see P.R. 193 at 2-3.  Accordingly,

---

[9] However, the court will not address arguments Plaintiffs raise in their original brief concerning Commerce's interpretation of CVD law prior to the enactment of the new law because they are moot in light of the court's decision upholding the constitutionality of the new law.

Commerce countervailed purchases of wire rod by GWK from these entities at LTAR.  I&D Memo at 44.

Plaintiffs argue that this determination was erroneous because Commerce "simply equated government 'control' in the form of an ownership interest with the existence of a government authority," Pls.' Br. at 38, and therefore ignored record evidence of legal reforms in China which indicated that entities owned by the GOC do not exercise government authority.  Id. at 40-43.  Plaintiffs insist that this conclusion ignored the actual issue: "whether an entity exercises elements of government authority."  Id. at 39. According to Plaintiffs, the five-factor test is the proper means of addressing this question.  Id.  In essence, Plaintiffs challenge Commerce's interpretation of 19 U.S.C. § 1677(5)(B), alleging that Commerce unreasonably construed "public entities" to include any entity that is majority-owned by a government.

"Public entity" is not defined in statutes or regulations. Where a statute is silent or ambiguous concerning the meaning of a term, the court must determine whether Commerce's interpretation is "based on a permissible construction of the statute."  Chevron v. NRDC, 467 U.S. 837, 843 (1984).  A reviewing court "is obliged to accept [Commerce's] position if Congress has not previously spoken to the point at issue and the agency's interpretation is reasonable."  United States v. Mead Corp., 533 U.S. 218, 229 (2001) (citing Chevron, 467 U.S. at 842-45).  The issue here is whether it was reasonable for Commerce to treat GWK's wire rod suppliers as

"authorities" within the meaning of 19 U.S.C. § 1677(5)(B) based solely on the GOC's majority-ownership interest in those suppliers.

Commerce explained that majority-ownership of an entity by the government creates a rebuttable presumption of government control over that entity. See I&D Memo at 43. It does not consult the five-factor test in this scenario because "a careful examination of the five factors reveals that when a government is the majority owner of a firm, factors one through four are largely redundant." Id. The redundancy occurs because "the government would normally appoint a majority of the members of the firm's board of directors who, in turn, would select the firm's managers, giving the government control over the entity's activities." Id. Commerce notes that a respondent may overcome this presumption if it can "demonstrate that majority ownership does not result in control of the firm." Id.

The court finds that Commerce's interpretation of "public entity" is reasonable. Because the purpose of CVD law is to offset the harm to domestic industries caused by foreign subsidies, see S. Rep. No. 1221, 92d Cong., 2d Sess. 8 (cited in Chaparral, 901 F.2d at 1103–04), it is reasonable for Commerce to attempt to detect and counteract all forms of foreign subsidies. Commerce's interpretation of "public entities" reflects the realities of corporate ownership and control and enables it to detect certain forms of subsidization which are not provided directly by the government but instead pass through private or quasi-private

channels. Furthermore, Commerce provides interested parties the opportunity to present evidence that the entity in question is not government controlled. See I&D Memo at 43. Accordingly, the court upholds Commerce's interpretation of "public entity." See Mead Corp., 533 U.S. at 229.

Ultimately, the standard for which Plaintiffs advocate is improper. Plaintiffs do not cite any instances in which Commerce evaluated "authority" status by determining whether the entity in question exercised elements of governmental authority. Plaintiffs ignore Commerce's "longstanding practice of treating most government-owned corporations as the government itself." CVD Final Rule, 63 Fed. Reg. at 65,402.[10] Although Plaintiffs correctly point out that Commerce previously declined to treat entities majority-owned by a government as authorities, see Issues and Decision Memorandum for the Final Determination in the CVD Investigation of Dynamic Random Access Memory Semiconductors from the Republic of Korea at 17, C-580-851 (June 16, 2003) ("DRAMS Memo"), Plaintiffs overlook the fact that the DRAMS Memo involved a factually distinct scenario concerning the temporary government takeover of private

---

[10]  Commerce has employed this practice in numerous CVD investigations and determinations. See Issues and Decision Memorandum for Final Determination in the CVD Investigation on Certain Welded Austenitic Stainless Pressure Pipe from the PRC at 16–17, C-570-931 (Jan. 21, 2009); Issues and Decision Memorandum for the Final Affirmative CVD Determination: Certain New Pneumatic Off-the-Road Tires from the PRC at 77, C-570-913 (July 7, 2008); Issues and Decision Memorandum for the Final Determination in the CVD Investigation of Circular Welded Carbon Quality Steel Pipe from the PRC at 62–63, C-570-911 (May 29, 2008).

banks due to a financial crisis.  See Preliminary Affirmative CVD Determination: Dynamic Random Access Memory Semiconductors From the Republic of Korea, 68 Fed. Reg. 16,766, 16,772 (Apr. 7, 2003). Plaintiffs simply fail to provide sufficient authority to support their preferred standard for evaluating government control.

Turning to Commerce's decision, the court must determine whether Commerce reasonably concluded that wire rod producers majority-owned by the GOC were "authorities."  Plaintiffs argue that Commerce's decision was erroneous because it ignored reforms in the PRC over the past twenty-five years that "effectively severed any public function from the commercial operations of SOEs such that SOEs do not exercise elements of governmental authority." Pls.' Br. at 40.  Plaintiffs cite several reforms directly, including the 1988 State-Owned Enterprises Law, the 1993 Company Law, and the establishment of the State-Owned Assets Supervision and Administration Committee ("SASAC") in 2003.  Id. at 40–42 (citing P.R. 129 at 3–4 & Ex. 8).  Because reforms in China demonstrate that GOC ownership of an entity does not result in that entity undertaking public functions, Plaintiffs insist that Commerce's determination was contrary to record evidence.[11]

Plaintiffs' argument must fail.  First, as noted above,

---

[11] Plaintiffs also assert that Commerce's determination was erroneous because steel pricing in the PRC is set by the market not by the GOC.  See Pls.' Br. at 42–43.  However, the relative commerciality of an act by a government or public entity is not relevant to the "authority" issue.  See Hynix Semiconductor Inc. v. United States, 30 CIT 288, 309, 425 F. Supp. 2d 1287, 1306 (2006).

Plaintiffs' argument addresses the wrong standard for government control. The issue is whether Plaintiffs provided sufficient evidence to demonstrate that government ownership does not result in government control. I&D Memo at 43. Plaintiffs evidence, however, indicates that under Chinese law, SOEs are directed not to perform public functions. See Pls.' Br. at 40-42. Second, Plaintiffs' argument fails to address any of Commerce's specific findings concerning the GOC-owned entities at issue. Plaintiffs provide general information regarding the operation of SOEs in the Chinese economy, but do not offer evidence that negates any of Commerce's specific findings. Finally, Plaintiffs appear to overstate the level of separation between government ownership and government control under Chinese law. As Plaintiffs themselves admit, the "SASAC is accorded the same rights of any shareholder in the enterprises in which it invests." Pls.' Br. at 41. Therefore, as a majority shareholder in an entity, SASAC would enjoy the rights belonging to any majority shareholder, including the right to appoint directors. Accordingly, Commerce's determination was supported by substantial evidence.

## 2. Wire Rod Suppliers Minority-Owned by the GOC

Commerce also determined that certain of GWK's wire rod suppliers were "authorities" even though they were minority-owned by the GOC and therefore countervailed wire rod purchases by GWK from these suppliers at LTAR. I&D Memo at 44. Because Commerce could not determine whether these suppliers were "authorities" on

the basis of ownership information alone, Commerce consulted the five-factor test to determine the extent of government control. See P.R. 193 at 3-10. Plaintiffs argue that Commerce did not consider "whether the entities in question were exercising elements of government authority," and failed to address evidence concerning substantial reforms in the PRC and the "lack of any price controls" in the PRC's wire rod market. See Pls.' Br. at 50.

Here, Commerce's determination is supported by substantial evidence. Commerce properly performed the five-factor test in accord with its prior practice. See I&D Memo at 43. Plaintiffs rehash the same flawed arguments they raised concerning wire rod suppliers that are majority-owned by the GOC. As noted above, Plaintiffs advocate for the wrong standard of reviewing "authority" status. Moreover, Plaintiffs' evidence concerning the reforms in the PRC and the relative commerciality of wire rod prices does not contradict Commerce's findings concerning the state-ownership of individual wire rod suppliers. Plaintiffs fail to demonstrate that Commerce's determination was unsupported by substantial evidence. Therefore, Commerce's decision to treat wire rod suppliers minority-owned by the GOC as "authorities" was proper.

## C. Wire Rod Purchased from Privately-Owned Trading Companies

Commerce also countervailed wire rod purchases GWK made from certain privately-owned trading companies. I&D Memo at 45. Although it did not find that the GOC provided GWK with a financial contribution directly, Commerce nonetheless found that GWK received

a subsidy because the trading companies received a financial contribution when they purchased wire rod from the GOC at LTAR, which enabled GWK to obtain wire rod from those trading companies at LTAR. Id. Plaintiffs argue that Commerce's decision is contrary to law because GWK never received a financial contribution. Pls.' Br. at 44. Alternatively, if the court finds that GWK received a financial contribution, Plaintiffs insist that Commerce's decision is still erroneous because Commerce neither conducted an upstream subsidy investigation nor demonstrated that the privately-owned trading companies were "authorities." See id. at 44–45.

A countervailable subsidy exists where an (1) "authority provides a financial contribution . . . to a person" and (2) "a benefit is thereby conferred." 19 U.S.C. § 1677(5)(B). Plaintiffs insist that the financial contribution requirement was not satisfied. Pls.' Br. at 44. A "financial contribution" is defined as:

> (i) the direct transfer of funds, such as grants, loans, and equity infusions, or the potential direct transfer of funds or liabilities, such as loan guarantees,
> (ii) foregoing or not collecting revenue that is otherwise due, such as granting tax credits or deductions from taxable income,
> (iii) providing goods or services, other than general infrastructure, or
> (iv) purchasing goods.

19 U.S.C. § 1677(5)(D). The GOC provided the private trading companies a financial contribution through the provision of wire

rod.  See I&D Memo at 45; 19 U.S.C. § 1677(5)(D)(iii).  The issue is whether that financial contribution is sufficient to satisfy the requirements of 19 U.S.C. § 1677(5)(B) with regards to GWK.

Plaintiffs argue that 19 U.S.C. § 1677(5)(B) requires Commerce to "find a financial contribution and a benefit to the respondent end user" in order to determine the existence of a countervailable subsidy.  Pls.' Br. at 44 (emphasis in original).  Plaintiffs rely on a passage from Delverde, SrL v. United States, in which the CAFC states that "[i]n order to conclude that a 'person' received a subsidy, Commerce must determine that a government provided that person with both a 'financial contribution' . . . and a 'benefit.'" 202 F.3d 1360, 1365 (2000); see Pls.' Br. at 44.  Because Commerce did not find that the GOC provided GWK with a financial contribution directly, Plaintiffs insist Commerce's determination was erroneous.  See Pls.' Br. at 44.

However, a close look at the CAFC's opinion in Delverde reveals that Plaintiffs' argument is flawed.  In Delverde, the respondent challenged Commerce's decision to impose CVDs on corporate assets it purchased after the provision of the subsidy to the prior owner, arguing that it never received a financial contribution.[12]  See 202 F.3d at 1362–63.  The CAFC held that in the case of a sale of corporate assets the meaning of "subsidy" under

---

[12] Although Delverde concerned the imposition of CVDs on corporate assets rather than merchandise, see 202 F.3d at 1362, the CAFC's analysis of 19 U.S.C. § 1677(5) is instructive.

19 U.S.C. § 1677(5) did not change. See id. at 1366. According to the CAFC, Commerce still must determine whether "a government provided both a financial contribution and a benefit to a person, either directly or indirectly, by one of the acts enumerated, before charging it with receipt of a subsidy." Id. Thus, the respondent end user need not directly receive the financial contribution as Plaintiffs insist.

Applying the CAFC's interpretation of 19 U.S.C. § 1677(5) to the instant case, the court finds that Commerce's determination was in accord with the law. The GOC provided a financial contribution to private trading companies. See 19 U.S.C. § 1677(5)(D)(iii). A benefit was conferred upon GWK through the provision of wire rod from said trading companies at LTAR. See 19 U.S.C. § 1677(5)(E)(iv) (A benefit is conferred "in the case where goods or services are provided, if such goods or services are provided for [LTAR]."). Essentially, Commerce found that GWK received the benefits of an indirect financial contribution, enabling it to purchase wire rod below the benchmark price. As the requirements of 19 U.S.C. § 1677(5) were satisfied, Commerce was not required to undergo an upstream subsidies analysis or determine that the trading companies in question were "authorities." Accordingly, Commerce's decision to countervail wire rod purchases from private trading companies was in accord with the law.

### D. Benchmark Price for Wire Rod

When determining a benchmark price for wire rod against which

to measure the adequacy of GWK's remuneration, Commerce selected a "world average price" instead of using the domestic market price in the PRC. I&D Memo at 52. Commerce bypassed market prices for wire rod in the PRC because it found that the prices were distorted as a result of the GOC's significant presence in the market. Id. at 51-52. Specifically, Commerce found that (1) "the GOC has direct ownership or control of at least 47.97[%] of wire rod production" in the PRC;[13] (2) wire rod imports comprised only 1.53% of the PRC's wire rod market; and (3) the GOC implemented export controls on wire rod including a "10[%] export tariff" and an "export licensing requirement." Id. at 15. Plaintiffs claim that Commerce's determination is inconsistent with mainstream economic theory and is unsupported by substantial evidence. See Pls.' Br. at 45-49.[14]

Commerce prefers to measure adequacy of remuneration "by comparing the government price to a market-determined price for the good or service resulting from actual transactions in the country in question." 19 C.F.R. § 351.511(a)(2)(i). However, "[i]f there is no useable market-determined price with which to make the

---

[13] Commerce noted that the GOC's market share may exceed 47.97% because "some companies that were classified as [Foreign Investment Enterprises ("FIEs")] by the GOC could be majority owned or controlled by the [GOC]." I&D Memo at 51. According to Commerce, information provided by the GOC indicates that the GOC treats any firms with at least 25% foreign invested ownership as FIEs. Id.

[14] Plaintiffs cite three works which they claim undermine Commerce's decision: Dennis W. Carlton & Jeffrey M. Perloff, Modern Industrial Organization (2d ed. 2004); Clement G. Krouse, Theory of Industrial Economics (1990); and Stephen Martin, Industrial Economics: Economic Analysis and Public Policy (2d ed. 1988).

comparison," Commerce measures adequacy of remuneration "by comparing the government price to a world market price where it is reasonable to conclude that such price would be available to purchasers in the country in question." Id. at § 351.511(a)(2)(ii). When determining whether the domestic market price is "useable," Commerce undertakes the following analysis:

> While we recognize that government involvement in a market may have some impact on the price of the good or service in that market, such distortion will normally be minimal unless the government provider constitutes a majority or, in certain circumstances, a substantial portion of the market. Where it is reasonable to conclude that actual transaction prices are significantly distorted as a result of the government's involvement in the market, we will resort to the next alternative in the hierarchy.

CVD Final Rule, 63 Fed. Reg. at 65,377. Thus, the issue is whether Commerce reasonably determined that wire rod prices were distorted as a result of the GOC's substantial involvement in the market.

According to Plaintiffs, "[e]conomic theory says that when there are a large number of non-affiliated firms there is little to no scope for strategic interaction among the firms." Pls.' Br. at 47. Given the large number of non-affiliated firms in the PRC's wire rod market, Plaintiffs contend that "[t]he competitive nature of the non-affiliated firms means their pricing decisions are driven by their costs and not by the strategic influence of the GOC's alleged control of other firms." Id. Plaintiffs add that in a market with a large number of sellers, "'sellers are likely to have at least slightly divergent notions about the most

advantageous price,'" and it is likely that "'at least one will be a maverick, pursuing an independent and aggressive pricing policy.'" Id. at 48 (quoting Frederic M. Scherer & David Ross, Industrial Market Structure and Economic Performance at 277 (Houghton Mifflin Co. 3d ed. 1990)).  Accordingly, Plaintiffs insist that wire rod prices in the PRC "reflect competitive market principles, not allegedly GOC-controlled SOE prices." Id. at 47.

Here, Plaintiffs fail to show that Commerce's determination was unreasonable or unsupported by substantial evidence.  Commerce reasonably concluded, based on information provided by the GOC, that the GOC had an interest in a substantial, near-majority share of the wire rod market.  See I&D Memo at 15.  Plaintiffs reliance on abstract economic theory fails to undermine this evidence.  At best, Plaintiffs' evidence indicates a theoretical level of competition between wire rod suppliers in the PRC.  Pls.' Br. at 47–48.  However, Commerce reasonably determined that the level of competition amongst these entities was not relevant, concluding that the GOC's substantial market share made it a "price leader, with which private firms are forced to compete." I&D Memo at 52.

Plaintiffs also argue that Commerce's conclusion that export controls on wire rod contribute to market distortion is not supported by substantial evidence.  Pls.' Br. at 48–49.  Specifically, Plaintiffs insist that Commerce "offered no evidence as to how the referenced measures significantly affected either pricing or volume of domestic production, exports or imports." Id.

at 49. In fact, Plaintiffs suggest that Commerce ignored evidence of the PRC's significant importation and exportation of wire rod in terms of volume, which indicated that the GOC does not distort market prices. Id. Therefore, Plaintiffs insist that it was erroneous for Commerce to conclude that the GOC's involvement in the wire rod market distorted prices. Id.

Plaintiffs' claims concerning the sufficiency of Commerce's evidence are also unavailing. Plaintiffs' argument appears to be based on the mistaken belief that Commerce must demonstrate with substantial evidence the specific distortive effect of each government action on wire rod prices. Id. However, the regulations only require Commerce to determine whether the GOC constitutes a substantial portion of the wire rod market, such that Commerce may reasonably conclude that prices are distorted. See CVD Final Rule, 63 Fed. Reg. at 65,377. As described above, Commerce relied on a number of factors indicating the substantial influence the GOC held over the wire rod market, including the GOC's near-majority market share, the low market share of wire rod imports, and regulations on the exportation of wire rod. See I&D Memo at 15, 51–52. Commerce reasonably concluded that the evidence, taken as a whole, demonstrated "the GOC's predominant role and contributed to the distortion of the domestic market in the PRC for wire rod." Id. at 51. Therefore, Commerce's determination to abandon the market price for wire rod in the PRC is consistent with its own regulations and is supported by

substantial evidence.  See <u>CVD Final Rule</u>, 63 Fed. Reg. at 65,377.

## CONCLUSION

For the foregoing reasons, the court finds that the new law, Pub. L. No 112-99, is constitutional.  The court also finds that the <u>Final Determination</u> is supported by substantial evidence and is otherwise in accord with the law.

## ORDER

In accordance with the above, it is hereby

**ORDERED** that the determination of Commerce is **SUSTAINED;** and it is further

**ORDERED** that this action is dismissed.


                                        /s/ NICHOLAS TSOUCALAS
                                     **Nicholas Tsoucalas**
                                        **Senior Judge**

**Dated:**     March 12, 2013
          **New York, New York**