# United States Court of Appeals for the Federal Circuit

---

**GUANGDONG WIREKING HOUSEWARES & HARDWARE CO., LTD.,**
*Plaintiff-Appellant,*

AND

**BUREAU OF FAIR TRADE FOR IMPORTS & EXPORTS, MINISTRY OF COMMERCE, THE PEOPLE'S REPUBLIC OF CHINA,**
*Plaintiff,*

**v.**

**UNITED STATES,**
*Defendant-Appellee,*

AND

**NASHVILLE WIRE PRODUCTS, INC. AND SSW HOLDING COMPANY, INC.,**
*Defendants-Appellees.*

---

2013-1404

---

Appeal from the United States Court of International Trade in No. 09-CV-0422, Senior Judge Nicholas Tsoucalas.

---

Decided: March 18, 2014

———————————

JAMES P. DURLING, Curtis, Mallet-Prevost, Colt & Mosle LLP, of Washington, DC, argued for plaintiff-appellant. With him on the brief were DANIEL L. PORTER, CHRISTOPHER DUNN, MATTHEW P. MCCULLOUGH, and ROSS BIDLINGMAIER.

ALEXANDER V. SVERDLOV, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee United States. With him on the brief were STUART F. DELERY, Assistant Attorney General, JEANNE E. DAVIDSON, Director, and FRANKLIN E. WHITE, JR., Assistant Director. Of counsel on the brief were JOHN D. MCINERNEY, Chief Counsel for Import Administration, United States Department of Commerce, of Washington, DC, DANIEL J. CALHOUN and DEVIN S. SIKES, Attorneys.

PAUL C. ROSENTHAL, Kelley Drye & Warren LLP, of Washington, DC, argued for defendants-appellees Nashville Wire Products, Inc., et al. With him on the brief were KATHLEEN W. CANNON, BENJAMIN BLASE CARYL, and KATHERINE E. WANG. Of counsel on the brief was DAVID C. SMITH, JR.

———————————

Before DYK, O'MALLEY, and CHEN, *Circuit Judges.*

Opinion for the court filed by *Circuit Judge* DYK.

Opinion concurring in the result filed by *Circuit Judge* O'MALLEY.

DYK, *Circuit Judge.*

Appellant Guangdong Wireking Housewares & Hardware, Co., Ltd. ("Wireking") appeals from a judgment of the Court of International Trade ("Trade Court"). In 2012, Congress enacted new legislation that overruled

our decision in *GPX Int'l Tire Corp. v. United States*, 666 F.3d 732 (Fed. Cir. 2011) (*"GPX I"*), *reh'g granted*, 678 F.3d 1308 (Fed. Cir. 2012) (*"GPX II"*), and permitted the imposition of both antidumping and countervailing duties with respect to importers from non-market economy ("NME") countries. Because this law is retroactive and does not require the Department of Commerce ("Commerce") to adjust for any double counting that may result from the retroactive imposition of both countervailing and antidumping duties, the appellant argues that it violates the Ex Post Facto Clause of Article I, Section 9 of the U.S. Constitution. We affirm the Trade Court's judgment that the new law does not violate the Ex Post Facto Clause.

BACKGROUND

I. Legislative and Judicial History

This case concerns two prior decisions of this court, *GPX I* and *GPX II*, and newly enacted legislation overruling our decision in *GPX I*.

The Tariff Act of 1930, as amended, permits Commerce to impose two types of duties on imports that injure domestic industries: First, Commerce may levy antidumping duties on goods "sold in the United States at less than . . . fair value." 19 U.S.C. § 1673 (2006). Second, Commerce may impose countervailing duties on goods that receive "a countervailable subsidy" from a foreign government. *Id.* § 1671(a). Thus, antidumping duties remedy unfair conduct on the part of importers, while countervailing duties are directed towards the unfair conduct of foreign governments.

In the case of goods imported from market economy countries, Commerce may impose both antidumping and countervailing duties. *GPX I*, 666 F.3d at 734. Commerce's ability to collect both types of duties from market economy importers has long been accepted. The antidumping duty equals the amount the good's price in the

exporting country (the "home market price" or "normal value") exceeds its price in the United States (the "export price" or "constructed export price"). *See* 19 U.S.C. §§ 1673, 1677a–1677b. If the importer is selling its product at a lower price in the United States than in its home market, this difference will result in an affirmative dumping margin. Whether a product is selling for less than fair market value can be determined by comparing the good's normal values with export (or constructed export) prices for comparable merchandise, using statistically calculated weighted averages or data from individual transactions. *See id.* § 1677f-1(d)(1)(A).

The countervailing duty is "the amount of the net countervailable subsidy." *See id.* § 1671(a). In other words, it equals the amount by which a foreign government subsidizes a particular product. To the extent that the subsidy reduces the home market price, the antidumping duty will be correspondingly reduced. *Id.* § 1677f-1(f)(1)(C).

With respect to NME countries, the method of calculating antidumping duties creates the possibility of double counting when both antidumping and countervailing duties are imposed. In NME countries, the "normal value" of a good is not calculated based on the actual home market sales price for antidumping purposes if Commerce determines that the available information does not permit it to calculate the good's "normal value." *Id.* § 1677b(c)(1)(B). Instead, in that scenario, the "normal value" is a surrogate calculation for the home market price in NME countries. The antidumping statute requires Commerce to estimate this "normal value"—the home market price—based on data from "appropriate" market economy countries. *Id.* Thus, Commerce uses unsubsidized market economy prices to calculate the "normal value" of NME imports. This method of calculating "normal value" or home market price does not take account of the subsidization NME importers may receive

that reduces the home market price. Therefore, the dual imposition of antidumping and countervailing duties on NME importers may double count for the subsidization advantage NME importers enjoy.

The history of countervailing duties with respect to NME countries is recounted in our *GPX I* decision and need not be repeated in detail here. *See GPX I*, 666 F.3d at 734-37. Briefly, until recently, countervailing duty law made no explicit provision with respect to NME countries and provided no explicit guidance as to how such duties should be levied on those countries. Commerce also maintained that it could not impose countervailing duties on NME importers. *Id.* at 735. However, in 2007, Commerce reversed its long-standing position and announced that it could and would apply countervailing duties to products of China, a NME country. *Id.*

This major policy change triggered the *GPX I* litigation. There, two Chinese tire manufacturers contested Commerce's imposition of countervailing duties on their imports, contending that countervailing duties could not be imposed with respect to China. *Id.* at 736. Based on an extensive review of the history of the Tariff Act, focusing on its subsequent amendments and reenactments, this court found that "in amending and reenacting the trade laws in 1988 and 1994, Congress adopted [Commerce's] position that countervailing duty law does not apply to NME countries. . . . We affirm the holding of the Trade Court that countervailing duties cannot be applied to goods from NME countries." *Id.* at 745.

About two and a half months after we released *GPX I*, Congress enacted new legislation that overruled our *GPX I* decision. *See* 158 Cong. Rec. H1167 (daily ed. Mar. 6, 2012) (statement of Rep. Camp) ("This legislation . . . overturns an erroneous decision by the Federal [C]ircuit that the Department of Commerce does not have the authority to apply these countervailing duty rules to

nonmarket economies."). The new law authorizes Commerce to impose countervailing duties on NME importers both prospectively as well as retrospectively.[1] To assure compliance with the United States' World Trade Organization ("WTO") obligations, this law contains a provision that instructs Commerce to "reduce the antidumping duty [applied to NME imports] by the amount of the increase in the weighted average dumping margin estimated by [Commerce] [to result from the imposition of countervailing duties]." Application of Countervailing Duty Provisions to Nonmarket Economy Countries, § 2(a), Pub. L. No. 112-99, March 13, 2012, 126 Stat. 265 (March 13, 2012) (codified as amended at 19 U.S.C. § 1677f-1(f)(1)(C)). Thus, the new law instructs Commerce to reduce the duties applied to NME imports when the antidumping and countervailing duties imposed on those goods double count for the same unfair trade advantage. This double-counting provision applies only *prospectively* to proceedings initiated after March 13, 2012, the date of the new law's enactment. *Id.* § 2(b). Trade proceedings initiated between November 20, 2006, and March 13, 2012, are subject to both antidumping and countervailing duties but do not benefit from this double-counting adjustment. *Id.* §§ 1(b), 2(b).

At the time this new legislation was enacted, the government had a pending petition for rehearing in *GPX I*, and the mandate had not yet issued in that case. On March 23, 2012, the United States filed a letter brief, requesting, in light of the new legislation, that the Court vacate *GPX I*. We granted the government's petition for

---

[1]    The new legislation applied countervailing duties retroactively to "all proceedings initiated . . . on or after November 20, 2006." Application of Countervailing Duty Provisions to Nonmarket Economy Countries, Pub. L. No. 112-99, March 13, 2012, 126 Stat. 265 (March 13, 2012).

rehearing, but declined to vacate our decision. Issuing a further decision on May 9, 2012 (*GPX II*), we determined that the new legislation changed the law: "[T]wo things are clear from the new legislation. First, Congress clearly sought to overrule our decision in *GPX*. . . . Second, . . . Congress changed the law . . . ." *GPX II*, 678 F.3d at 1311.

The Chinese exporters argued that the new legislation was unconstitutional because "it attempts to prescribe a rule of decision for this case after [the Federal Circuit's] decision in *GPX* was rendered." *Id.* at 1312. Nevertheless, we concluded that this argument was meritless under *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 226 (1995), and we were bound to apply the new law to the pending case as long as the new law was constitutional. *See GPX II*, 678 F.3d at 1312. The Chinese importers also challenged the constitutionality of the new law because it provided no retrospective double-counting adjustment. They argued that it "creates a situation in which both antidumping and countervailing duties may be imposed, without providing a mechanism to account for potential double counting." *Id.* Noting that this argument raised a "question of first impression as to which we have received only cursory briefing," we remanded the case to the Trade Court to consider that constitutional issue in the first instance. *Id.* at 1312-13. Our decision in *GPX II* mandated on May 16, 2012.

## II. The Wireking Case

Wireking was one of many importers directly affected by the significant change in trade law. The present case was pending in the Trade Court at the time of our remand in *GPX I* and raised the same constitutional issue as the *GPX* case. Before the new law was enacted, on July 31, 2008, U.S. producers filed a petition with Commerce and the U.S. International Trade Commission seeking the imposition of antidumping and countervailing duties on imports of certain kitchen appliance shelving and racks

from China. In response to this petition, Commerce initiated dual duty investigations on August 20, 2008. These antidumping and countervailing duty investigations examined Wireking's imports from January 1, 2008, to June 30, 2008, and January 1, 2007, to December 31, 2007, respectively. By early 2009, Commerce selected Wireking as a mandatory respondent for both its antidumping and countervailing duty investigations. As a result of these investigations, Commerce issued final antidumping and countervailing duty determinations on July 24 and 27, 2009, respectively.

To determine the antidumping margin applicable to Wireking's imports, Commerce relied on the statutorily prescribed NME analysis: instead of using the actual home market prices for the inputs Wireking used to manufacture its kitchen shelving and racks, Commerce calculated the margin using a higher, "normal value" for the product's inputs based on market economy values of the inputs. The primary raw material (input) Wireking used to manufacture kitchen shelving and racks was steel wire rod. Accordingly, Commerce used a surrogate, "normal value" of steel wire rod to calculate the home market price of Wireking's imports. This resulted in an antidumping duty rate equal to 95.99 percent.

Commerce also imposed a countervailing duty on Wireking of 13.30 percent. The bulk of this duty can be attributed to

> the difference between the delivered world market price and what [Wireking] paid for wire rod produced by the [Government of China] during the [period of interest]. . . . [Commerce] divided this by [Wireking's] total sales during the [period of interest]. On this basis, [Commerce] calculated a net countervailable subsidy rate of 11.76 percent *ad valorem* for Wire king [as a penalty for the wire rod subsidy it received].

J.A. 63 (internal citation omitted). Because the market economy rate used to calculate Wireking's antidumping duty was unaffected by the government subsidization Wireking received, Wireking contended that the "simultaneous imposition of these special NME [antidumping] measures and market economy [countervailing duty] measures . . . demonstrates the imposition of a double remedy" and was improper. Appellant's Br. 7. Ultimately, Commerce rejected this argument and imposed a net countervailing duty rate of 13.30 percent on Wireking.

Wireking appealed Commerce's final antidumping and countervailing duty determinations to the Trade Court on October 5, 2009. The Trade Court stayed Wireking's appeal, pending the outcome of the *GPX* proceedings. After our decision in *GPX II* mandated on May 16, 2012, Wireking amended its complaint to include the constitutional challenge to the new legislation.

Wireking did not contest Commerce's application of antidumping duties to Chinese imports; instead, it contested Commerce's *simultaneous* imposition of countervailing and antidumping duties, without adjusting for double counting for the same conduct.[2] Wireking contended that, due to this failure to eliminate double counting,

---

[2]  Wireking also argued that the "distortion" resulting from the simultaneous imposition of antidumping and countervailing duties without adjustment for double counting affected the required injury determination and were "compounded by the fact that in sunset reviews, under current law, the Department of Commerce always utilizes the [antidumping] and [countervailing duty] margins from the original investigation as the 'likely' [antidumping] and [countervailing duty] margins that will exist upon revocation, and the Commission must accept these Commerce findings in its own sunset analysis." Appellant's Br. 43.

the trade remedies were not related and proportional to the harm suffered and, therefore, constituted a penalty and violated the Ex Post Facto Clause.[3] At this stage of the proceedings, Wireking had not established the existence of double counting in this particular case, and if it had occurred, to what extent.

The Trade Court granted judgment in favor of the government. It declined to decide whether the new law had a retroactive effect, but found that Commerce's simultaneous imposition of antidumping and countervailing duties on Wireking was not penal and, therefore, did not violate the Ex Post Facto Clause even if it were retroactive. *Guangdong Wireking Housewares & Hardware Co., Ltd. v. United States*, 900 F. Supp. 2d 1362, 1370-71 (Ct. Int'l Trade 2013). The Trade Court first explained that "[i]t is well established that trade duties are remedial, not punitive," and "[t]he specific purpose of [countervailing duty] law is to 'offset' the harmful effects of foreign subsidies." *Id.* at 1370. The Trade Court then concluded that the new law was not punitive because Wireking failed to show "the absence of an association between the costs imposed and the actual harm done." *Id.* at 1371 (internal quotation marks omitted). Wireking timely appealed. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5). We review the Trade Court's decision of the constitutional question de novo.

---

[3] Wireking also raised other constitutional objections to the 2012 legislation, which the Trade Court rejected. *Guangdong Wireking Housewares & Hardware Co., Ltd. v. United States*, 900 F. Supp. 2d 1362, 1372-76 (Ct. Int'l Trade 2013). Wireking has abandoned these other constitutional claims on appeal.

DISCUSSION

Article I, Section 9, Clause 3 of the Constitution states "[n]o Bill of Attainder or ex post facto Law shall be passed." U.S. Const. art. I, § 9, cl. 3. A law only violates the Ex Post Facto Clause if it (1) applies retroactively and (2) imposes a punishment for an act that was not punishable at the time it was committed or increases the punishment for an act that was committed before the new law was enacted. *Weaver v. Graham*, 450 U.S. 24, 28-29 (1981). We first address whether the 2012 law is retroactive.

## I. Retroactivity

As the Supreme Court held in *Weaver v. Graham*, "for a criminal or penal law to be *ex post facto*[] it must be retrospective, that is, it must apply to events occurring before its enactment." 450 U.S. at 29; *see Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994) (defining a retroactive law as one that affects conduct that occurred before its enactment). The conduct at issue in the present suit is Wireking's importation of certain kitchen appliance shelving and racks from China during the period before the enactment of the 2012 legislation. The antidumping and countervailing duty proceedings with respect to that conduct were initiated on August 27, 2008, and August 26, 2008, respectively. Designed to reach all NME countervailing duty proceedings that were "initiated . . . on or after November 20, 2006," the 2012 amendment applies retroactively to Wireking's imports before the 2012 legislation. Application of Countervailing Duty Provisions to Nonmarket Economy Countries, § 2(b)(1), Pub. L. No. 112-99, March 13, 2012, 126 Stat. 265 (March 13, 2012).

Nevertheless, the government contends that the 2012 amendment to the Tariff Act does not have a retroactive effect, *i.e.*, it did not change the law. The government argues that (1) the 2012 law renders the *GPX I* decision a nullity and (2) *GPX I* was wrongly decided—trade law has

always permitted Commerce to impose countervailing duties on NME imports. We find the government's arguments unpersuasive.

A

The government first argues that the new law nullified *GPX I* and that decision has no legal effect. There is no language in the 2012 legislation purporting to nullify *GPX I* (as opposed to overruling it), and the legislation was enacted without the benefit of committee reports. To support its position, the government cites statements made by members of the House of Representatives, explaining that the new law would overturn the *GPX I* decision.[4] The government contends such statements prove that "Congress uniformly did not want the *GPX I* opinion to have any legal effect." Appellee's Br. 17. Even if the statements made during the House floor debate were viewed as an authority, they simply speak to Congress's desire to change the law. Nothing in the congressional record shows an intent to nullify *GPX I* rather than simply overturn it.

In any event, while Congress has the power to overrule *GPX I* (assuming that the new law does not impose punishment), Congress does not possess the power to nullify our decision retroactively so that the question of punishment becomes irrelevant. In *Plaut*, the Supreme Court clarified that "Congress can always revise the judgments of Article III courts in one sense: When a new law makes clear that it is retroactive, an appellate court must apply that law in reviewing judgments still on

---

[4]    For example, Representative Levin stated, "[w]ith this bill, we are making clear that the Federal [C]ircuit's decision was wrong and that it cannot stand." 158 Cong. Rec. H1167 (daily ed. Mar. 6, 2012) (statement of Rep. Levin).

appeal that were rendered before the law was enacted, and must alter the outcome accordingly." 514 U.S. at 226; *Robertson v. Seattle Audubon Soc.*, 503 U.S. 429, 441 (1992). Therefore, if a judicial decision is not yet final, Congress may change the law applicable generally, and the court must apply the changed law to pending cases. Congress may not, however, nullify particular decisions by "prescrib[ing a] rule[] of decision to the Judicial Department." *United States v. Klein*, 80 U.S. 128, 146 (1871); *see Plaut*, 514 U.S. at 218. Thus, to change the outcome of a pending legal decision, Congress must change the underlying law; it may *not* tell a court how to interpret existing laws. Just so, while it was lawful for Congress to change the relevant legislation while the *GPX* litigation was pending, it would not have been lawful for Congress to dictate to this court how to interpret the Tariff Act as it existed at the time of the *GPX I* litigation. Accordingly, the 2012 amendment does not nullify this court's reasoning and conclusion in *GPX I*. To paraphrase the Supreme Court, *GPX I* "provides the authoritative interpretation of the [statute] . . . before the [2012] amendment went into effect . . . . That interpretation provides the baseline for our conclusion that the [2012] amendment would be 'retroactive' if applied to cases arising before that date." *Rivers v. Roadway Exp., Inc.*, 511 U.S. 298, 313 (1994). Adopting the government's view would mean that no legislative change would ever be retroactive so long as Congress determined that the original decision interpreting the law before the amendment was incorrect. There is no support for such a theory. The 2012 amendment did not nullify our opinion in *GPX I*, but, instead, attempted to change trade law retroactively.

In addition to its argument regarding Congress's intent in enacting the 2012 amendment, the government also argues that "*GPX I* cannot be considered to be an authoritative statement of law because it never became final." Appellee's Br. 19. The government contends that

because *GPX I* never mandated, while *GPX II* did, the decision rendered in *GPX I* should be "disregarded," Appellee's Br. 22, as it carries "no weight." *Id.* at 24. It is undisputed that *GPX I* was not a final decision. Nevertheless, this lack of finality does not, as the government suggests, sap *GPX I* of its persuasive force. As we previously explained, the government invited this court to vacate *GPX I*, and we declined to do so. Instead, we reheard *GPX* and applied the new law to its facts. Thus, even though *GPX I* was not a final decision, it still stands as a statement of the law at the time of its decision.

B

Alternatively, the government attempts to re-litigate the issue we decided in *GPX I* and asks us to overrule that decision. The government contends that the "plain language" of the Tariff Act has always required Commerce to apply countervailing duties to NME imports "in the same way it was required to apply countervailing duties to any other imports that benefitted from a countervailable subsidy." Appellee's Br. 12.

We considered and rejected this argument in *GPX I*. As previously explained, *GPX I* held that Congress previously "adopted the position that countervailing duty law does not apply to NME countries." *GPX I*, 666 F.3d at 745. Therefore, prior to March 2012, Commerce could not impose countervailing duties on NME imports. *Amber Res. Co. v. United States*, 538 F.3d 1358, 1370 (Fed. Cir. 2008) ("[C]ourt decisions construing statutes are typically viewed as not changing the law but merely announcing what the law has meant since its enactment . . . ."). We remain persuaded that our opinion in *GPX I* reflects the correct interpretation of the Tariff Act at the time of the decision. The government's current attempt to re-litigate *GPX I* is unavailing.

## II. Ex Post Facto Analysis

Since the 2012 amendment operates retroactively, we must determine whether its provisions are penal legislation that violate the Ex Post Facto Clause. The Ex Post Facto Clause forbids the government from punishing individuals for actions that were lawful at the time of their execution. *Weaver*, 450 U.S. at 28. Because the Ex Post Facto Clause prohibits retroactive punishment, this constitutional provision is directed at statutes that "'retroactively alter the definition of crimes or increase the punishment for criminal acts.'" *Cal. Dep't of Corr. v. Morales*, 514 U.S. 499, 504-05 (quoting *Collins v. Youngblood*, 497 U.S. 37, 43 (1990)); *Calder v. Bull*, 3 U.S. (Dall.) 386, 390 (1798). There is no dispute that the Tariff Act and the 2012 amendment are civil in nature. Thus, they fall outside the scope of the Supreme Court's traditional ex post facto analysis.

Nevertheless, in rare circumstances, the Supreme Court has held that a civil law violates the Ex Post Facto Clause because the law was punitive. So far as we have been able to determine, the Supreme Court has held a civil statute violates the Ex Post Facto Clause on three occasions and in no instance since 1878. *See Burgess v. Salmon*, 97 U.S. 381, 384 (1878) (retroactive application of a tax increase on tobacco violated the Ex Post Facto Clause); *Cummings v. Missouri*, 71 U.S. 277, 325-29 (1866) (Missouri law that imposed fines on priests for ministering without first taking an oath denying past sympathy for Confederacy violated the Ex Post Facto Clause); *Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 138 (1810) (Georgia law that retroactively terminated a right to property constituted an ex post facto violation). These cases represent a narrow exception to the general rule that the Ex Post Facto Clause only applies to laws that alter the criminal penalties associated with particular conduct. Wireking argues that the 2012 amendment falls within this narrow exception.

The Supreme Court's standard for determining when a civil law can be deemed punitive is most clearly spelled out in the Court's decision in *Smith*, 538 U.S. 84 (2003), based on the Court's earlier decision in *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69 (1963). This standard is exacting and difficult to satisfy. Under this standard, we must first "ascertain whether the legislature meant the statute to establish 'civil' proceedings." *Id.* at 92 (quoting *Kansas v. Hendricks*, 521 U.S. 346, 361 (1997)) (internal quotation marks omitted).

> If the intention of the legislature was to impose punishment, that ends the inquiry. If, however, the intention was to enact a regulatory scheme that is civil and nonpunitive, we must further examine whether the statutory scheme is "'so punitive either in purpose or effect as to negate [the State's] intention' to deem it 'civil.'"

*Id.* (quoting *Hendricks*, 521 U.S. at 361 (quoting *United States v. Ward*, 448 U.S. 242, 248-49 (1980))).

A

As to the first inquiry, there can be no serious question that Congress intended to create a civil remedy rather than impose punishment. The congressional intent behind the enactment of countervailing duty and antidumping law generally was to create a civil regulatory scheme that remedies the harm unfair trade practices cause. *See infra* Slip. Op. at 21. As the Trade Court noted, "[antidumping] and [countervailing duties] are separate remedies that counteract different anticompetitive behaviors. . . . The imposition of one type of duty does not obviate the need for the other, nor does it address the harm caused by the conduct the other duty is designed to remedy." *Guangdong*, 900 F. Supp. 2d at 1371 (citation omitted). As the House floor debate demonstrates, this remedial intent drove Congress to enact the 2012 law. *See* 158 Cong. Rec. H1168-73 (daily ed. Mar. 6, 2012) (various

remarks stating that the new law would "level the playing field" and ensure that Commerce could adequately remedy China's unfair trade practices). Indeed, almost every speaker emphasized the curative purpose of the new legislation. *Id.* H1169 (statement of Rep. Ellmers) ("These duties are not punitive; they merely serve as a correction to unfair Chinese subsidies."); *id.* H1168 (statement of Rep. Neal) ("Countervailing duties level the playing field for U.S. employers and workers and allow them to compete against imports that are subsidized through unfair trade practices, emphasis on the word 'unfair.'"); *id.* H1168 (statement of Rep. Boustany) ("This bill restores Commerce's ability to protect American jobs and companies from unfair . . . trade practices perpetrated by non-market economies . . . ."). These statements demonstrate the new law's overall remedial intent.

Congress's decision to direct Commerce to adjust for double counting prospectively, but not retrospectively, does not undermine Congress's overarching remedial intent. Congress enacted the prospective adjustment provision to ensure that the United States complied with its WTO obligations.[5] Instead, it demonstrates Congress's

---

[5] The Congressmen that introduced the bill, Representatives Camp, Levin, Brady, and McDermott, explained that the proposed law included a prospective double-counting provision to ensure compliance with the United States' WTO obligations. *See* Press Release, Committee on Ways and Means, Camp, Levin, Brady, and McDermott Introduce Legislation to Ensure Commerce Department Can Continue to Apply Countervailing Duty Laws to Non-Market Economies Like China (Feb. 29, 2012), *available at* http://waysandmeans.house.gov/news/documentsingle.aspx?DocumentID=282425; *see also* 158 Cong. Rec. H1167 (daily ed. Mar. 6, 2012) (statement of Rep. Camp) ("This legislation . . . brings the United States

desire to do no more than is necessary to comply with the United States' WTO obligations in light of the complexity of double-counting calculations. Thus, we find that Congress enacted the 2012 amendment to modify the civil regulatory scheme, not to impose punishment.

## B

Having resolved the first inquiry, we must turn to the second: Is the 2012 amendment "so punitive either in purpose or effect as to negate [Congress's] intention to deem it civil?" *Smith*, 538 U.S. at 92 (internal quotations omitted). In contrast to the first question, which focuses on Congress's overall intent in enacting the new law, the second question examines the law's specific objectives and effects.

In *Smith*, the Supreme Court, following *Mendoza-Martinez*, articulated seven factors that help guide this inquiry: (1) whether the sanction "has been regarded in our history and traditions as a punishment"; (2) whether it "imposes an affirmative disability or restraint"; (3) whether it "promotes the traditional aims of punishment"; (4) whether it "has a rational connection to a nonpunitive

---

into compliance with its [WTO] obligations by requiring the Department of Commerce to make an adjustment when there is evidence of a double remedy."). Senators Baucus and Thune, who introduced the parallel bill in the Senate, made similar statements. *See* Press Release, Committee on Finance, Baucus, Thune Introduce Bill to Protect U.S. Jobs, Fight Unfair Chinese Subsidies with Countervailing Duties (Feb. 29, 2012), *available at* http://www.finance.senate.gov/newsroom/chairman/releas e/?id=1611b6e1-f691-4223-933b-b980771e16b2. Thus, the failure to enact a retrospective double-counting adjustment does not represent, as Wireking contends, a desire to punish Chinese importers.

purpose"; (5) whether it "is excessive with respect to this purpose"; (6) "whether the regulation comes into play only on a finding of *scienter*"; and (7) "whether the behavior to which it applies is already a crime." *Smith*, 538 U.S. at 97, 105; *see Seling v. Young*, 531 U.S. 250, 272 n.3 (2001) (recounting the seven factors); *Hudson v. United States*, 522 U.S. 93, 99-100 (1997) (listing the seven factors). The Court also instructed that "these factors must be considered in relation to the statute on its face," *Mendoza-Martinez*, 372 U.S. at 169, and "'only the clearest proof' will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty." *Hudson*, 522 U.S. at 100 (quoting *Ward*, 448 U.S. at 249).

Unfortunately, neither party has addressed the Supreme Court's clear seven-factor inquiry. Instead, the parties focused almost entirely on a three-factor test this court introduced in *Huaiyin Foreign Trade Corp. v. United States*, 322 F.3d 1369, 1380 (Fed. Cir. 2003). Under this test, a statute only imposes a penalty when:

> (1) the costs imposed are unrelated to the amount of actual harm suffered and are related more to the penalized party's conduct, (2) the proceeds from infractions are collected by the state, rather than paid to the individual harmed, and (3) the statute is meant to address a harm to the public, as opposed to remedying a harm to an individual.

*Huaiyin*, 322 F.3d at 1380 (quoting *Ingalls Shipbuilding, Inc. v. Dalton*, 119 F.3d 972, 978 (Fed. Cir. 1997) (discussing when a statute imposes a penalty in the context of contract law)). Nevertheless, as both parties conceded at oral argument and *Huaiyin* itself suggests, 322 F.3d at 1380-81, the three-part *Huaiyin* test is not exclusive and was developed without the benefit of the Supreme Court's decision in *Smith*, which was decided less than a month before *Huaiyin* and never cited in it. The component parts

of *Huaiyin* test largely overlap aspects of the Supreme Court's seven part test.

1

The first three and final two *Smith* factors do not support a finding that the 2012 law is punitive. They cut in the opposite direction. Under the first factor, as described in greater detail below, countervailing duties have not "been regarded in our history and traditions as a punishment." *Smith*, 538 U.S. at 97; *see Nucor Corp. v. United States*, 414 F.3d 1331, 1336 (Fed. Cir. 2005); *Huaiyin*, 322 F.3d at 1380, 1381; *Chaparral Steel Co. v. United States*, 901 F.2d 1097, 1103-04 (Fed. Cir. 1990). Under the second factor, the 2012 amendment does not constitute "an affirmative disability or restraint." *Smith*, 538 U.S. at 97. This reference to disability or restraint concerns the liberty of individual persons. As the Supreme Court explained in *Smith*, the paradigmatic affirmative disability or restraint is physical restraint, *i.e.*, imprisonment. *Id.* at 100 (citing *Hudson*, 522 U.S. at 104). Such restraints are not at issue here. With respect to the third factor, the 2012 amendment does not promote the "traditional aims of punishment." *Id.* at 97. Instead, the amendment creates a remedy for unfair conduct when it occurs. The sixth and seventh factors—"whether the regulation comes into play only on a finding of *scienter*" and "whether the behavior to which it applies is already a crime"—are not applicable to the present case. *Id.* at 105. We find that these factors weigh against a finding that the 2012 law is punitive.

2

Only two of the seven *Smith* factors (the fourth and fifth factors) could possibly support Wireking's position. And these two factors overlap with the three factors articulated in *Huaiyin*. The fourth factor is essentially directed towards determining whether the law has an alternative, non-punitive purpose. The fifth factor ad-

dresses the relationship between the law's effects and its purported remedial purpose.

The fourth *Smith* factor—whether the regulation "has a rational connection to a nonpunitive purpose," *id.* at 97—is both "a '[m]ost significant' factor," *id.* at 102 (quoting *United States v. Ursery*, 518 U.S. 267, 290 (1996)), and the most relevant to this case. It is well established that antidumping and countervailing duty laws are remedial in nature. Both the courts and Congress have consistently confirmed this understanding. *See Nucor*, 414 F.3d at 1336 ("[T]he purpose of antidumping and countervailing duty laws is remedial, not punitive or retaliatory."); *Huaiyin*, 322 F.3d at 1380, 1381; *Chaparral Steel*, 901 F.2d at 1103-04 (clarifying that trade duties are intended to be "solely remedial"); *Peer Bearing Co. v. United States*, 182 F. Supp. 2d 1285, 1310 (Ct. Int'l Trade 2001); *Badger-Powhatan v. United States*, 608 F. Supp. 653, 656 (Ct. Int'l Trade 1985); S. Rep. No. 92-1221, at 8 (1972) (Conf. Rep.) ("[C]ountervailing duties are not, nor were they ever intended to be, penal in nature; they are remedial in nature inasmuch as they operate to offset the effect of subsidies afforded foreign merchandise."). Indeed, Wireking itself concedes that "countervailing duty and antidumping laws in general are remedial in nature," Appellant's Br. 48, "[these duties] in general address different issues," Appellant's Reply Br. 17, and countervailing duty law "in general imposes duties that are proportional to the harm." *Id.* Thus, the primary purpose of antidumping and countervailing duties generally is *remedial*, not punitive.

The current amendment does not stray from the remedial nature of trade duties generally. The 2012 amendment enables Commerce to apply countervailing duties to NME imports. Thus, this law simply extends Commerce's ability to impose countervailing duties to a new group of importers. And like countervailing duty law generally, the specific purpose of the new law is to remedy

the harm American manufacturers and their workers experience as a result of unfair foreign trade practices. Although the government, as opposed to American manufacturers themselves, receives the duties levied on NME imports, the specific purpose of these laws is to level the playing field for particular American manufacturers, which is relevant under the third *Huaiyin* factor. *Huaiyin*, 322 F.3d at 1380 ("remedying a harm to an individual" suggests that the law is non-punitive). Thus, like antidumping and countervailing duties generally, the specific purpose of the 2012 amendment is remedial, not punitive.

3

Wireking focuses primarily on the fifth factor—whether the regulation "is excessive with respect to this purpose," *Smith*, 538 U.S. at 97—a factor similar to the first *Huaiyin* factor—whether "the costs imposed are unrelated to the amount of actual harm suffered and are related more to the penalized party's conduct." *Huaiyin*, 322 F.3d at 1380. Wireking admits that the imposition of both antidumping and countervailing duties on imports from NME countries does not in and of itself have a punitive effect. Indeed, Wireking admits that the law would not violate the Ex Post Facto Clause if it simply made no adjustment at all for double counting. The law's vice, in Wireking's view, is that it makes no double-counting adjustment for proceedings commenced between November 20, 2006, and March 13, 2012, while adjusting for proceedings commenced thereafter. Wireking argues that the antidumping and countervailing duties it must pay account for the same subsidies, and this double counting derogates the law's remedial effect and renders it punitive.

Wireking's mistake lies in its attempt to parse the antidumping law into discrete parts and apply the ex post facto analysis to each detached portion. Even if the 2012 law could be considered separately from the overall anti-

dumping and countervailing duty law, treating aspects of the 2012 legislation in isolation is not consistent with Supreme Court authority. In *Smith*, the appellees made a similar argument to the one set forth in the case: they contended that the law at issue, a sex offender registration statute, lacked the necessary regulatory connection because it was not "'narrowly drawn to accomplish the stated purpose.'" *Smith*, 538 U.S. at 103 (quoting Brief for Respondents 38). The Ninth Circuit agreed with the appellees, finding that the law was "excessive in relation to its regulatory purpose . . . [because]: first, . . . the statute applie[d] to all convicted sex offenders without regard to their future dangerousness; and, second, . . . it place[d] no limits on the number of persons who ha[d] access to the information." *Id.*

In response to this argument, the Supreme Court explained that, "[a] statute is not deemed punitive simply because it lacks a close or perfect fit with the nonpunitive aims it seeks to advance." *Id.* The Court repeatedly emphasized that even though a law may, in certain circumstances, have an effect that resembles punishment, such imperfect legislation cannot be deemed punitive if its *principal* impact is non-punitive. *Id.* at 99, 100, 102, 103. So here.

Although the 2012 amendment may permit some retroactive double counting, this small "imprecision" does not vitiate the law's remedial effect generally. *See also Seling*, 531 U.S. at 263. While the remedial purpose of the 2012 law may "lack[] a close or perfect fit" with its overarching remedial intent, such a potential flaw does not render it punitive. *Smith*, 538 U.S. at 103. The predominant effect of the new law is remedial. Indeed, if perfect proportionality were necessary to prevent a remedial duty from transforming into a punitive one, most trade laws would fall if applied retroactively since, as we have recognized in past cases, imperfections are a feature of trade law generally. *See, e.g.*, *Changzhou Wujin Fine Chem. Factory Co., Ltd.*

*v. United States*, 701 F.3d 1367, 1376 (Fed. Cir. 2012) ("We have recognized that in some circumstances, antidumping investigations require calculations that are 'by necessity imperfect . . . .'").

Wireking's approach is particularly problematic because double counting is hardly a simple calculation, as this case demonstrates and the 2012 legislation recognized by providing for relief only where "the administering authority is []able to identify and measure subsidies provided by the government of the nonmarket economy country." Application of Countervailing Duty Provisions to Nonmarket Economy Countries, Pub. L. No. 112-99, March 13, 2012, 126 Stat. 265 (March 13, 2012). In this case, it is not entirely clear that such double counting has even occurred. The existence of an ex post facto violation cannot depend on the existence of a complex and unclear calculation designed to determine whether the law goes beyond what is necessary to remedy the injury incurred in a particular case.

In summary, Wireking has not shown, let alone by the clearest proof, that the absence of a retrospective double-counting provision negates the law's predominantly remedial impact. Thus, under the *Smith* analysis, we find that the 2012 law is not punitive and does not violate the Ex Post Facto Clause.

**AFFIRMED**

## APPENDIX

Public Law 112–99

112th Congress

**An Act**

**To apply the countervailing duty provisions of the Tariff Act of 1930 to nonmarket economy countries, and for other purposes.**

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

### SECTION 1. APPLICATION OF COUNTERVAILING DUTY PROVISIONS TO NONMARKET ECONOMY COUNTRIES.

(a) In General.—Section 701 of the Tariff Act of 1930 (19 U.S.C. 1671) is amended by adding at the end the following:

"(f) Applicability to Proceedings Involving Nonmarket Economy Countries.—

"(1) In General.—Except as provided in paragraph (2), the merchandise on which countervailing duties shall be imposed under subsection (a) includes a class or kind of merchandise imported, or sold (or likely to be sold) for importation, into the United States from a nonmarket economy country.

"(2) Exception.—A countervailing duty is not required to be imposed under subsection (a) on a class or kind of merchandise imported, or sold (or likely to be sold) for importation, into the United States from a nonmarket economy country if the administering authority is unable to identify and measure subsidies provided by the government of the nonmarket economy country or a public entity

within the territory of the nonmarket economy country because the economy of that country is essentially comprised of a single entity."

(b) Effective Date.—Subsection (f) of section 701 of the Tariff Act of 1930, as added by subsection (a) of this section, applies to—

(1) all proceedings initiated under subtitle A of title VII of that Act (19 U.S.C. 1671 et seq.) on or after November 20, 2006;

(2) all resulting actions by U.S. Customs and Border Protection; and

(3) all civil actions, criminal proceedings, and other proceedings before a Federal court relating to proceedings referred to in paragraph (1) or actions referred to in paragraph (2).

## SEC. 2. ADJUSTMENT OF ANTIDUMPING DUTY IN CERTAIN PROCEEDINGS RELATING TO IMPORTS FROM NONMARKET ECONOMY COUNTRIES.

(a) In General.—Section 777A of the Tariff Act of 1930 (19 U.S.C. 1677f–1) is amended by adding at the end the following:

"(f) Adjustment of Antidumping Duty in Certain Proceedings Relating to Imports from Nonmarket Economy Countries.—

"(1) In General.—If the administering authority determines, with respect to a class or kind of merchandise from a nonmarket economy country for which an antidumping duty is determined using normal value pursuant to section 773(c), that—

"(A) pursuant to section 701(a)(1), a countervailable subsidy (other than an export subsidy referred to in section 772(c)(1)(C))

has been provided with respect to the class or kind of merchandise,

"(B) such countervailable subsidy has been demonstrated to have reduced the average price of imports of the class or kind of merchandise during the relevant period, and

"(C) the administering authority can reasonably estimate the extent to which the countervailable subsidy referred to in subparagraph (B), in combination with the use of normal value determined pursuant to section 773(c), has increased the weighted average dumping margin for the class or kind of merchandise,

the administering authority shall, except as provided in paragraph (2), reduce the antidumping duty by the amount of the increase in the weighted average dumping margin estimated by the administering authority under subparagraph (C).

"(2) Maximum Reduction in Antidumping Duty.— The administering authority may not reduce the antidumping duty applicable to a class or kind of merchandise from a nonmarket economy country under this subsection by more than the portion of the countervailing duty rate attributable to a countervailable subsidy that is provided with respect to the class or kind of merchandise and that meets the conditions described in subparagraphs (A), (B), and (C) of paragraph (1).".

(b) Effective Date.—Subsection (f) of section 777A of the Tariff Act of 1930, as added by subsection (a) of this section, applies to—

(1) all investigations and reviews initiated pursuant to title VII of that Act (19 U.S.C. 1671 et seq.) on or after the date of the enactment of this Act; and

(2) subject to subsection (c) of section 129 of the Uruguay Round Agreements Act (19 U.S.C. 3538), all determinations issued under subsection (b)(2) of that section on or after the date of the enactment of this Act.

Approved March 13, 2012.

*LEGISLATIVE HISTORY*—H.R. 4105 (S.2153):

CONGRESSIONAL RECORD, Vol. 158 (2012):

Mar. 6, considered and passed House.

Mar. 7, considered and passed Senate.

# United States Court of Appeals for the Federal Circuit

—————————

**GUANGDONG WIREKING HOUSEWARES & HARDWARE CO., LTD.,**
*Plaintiff-Appellant,*

**AND**

**BUREAU OF FAIR TRADE FOR IMPORTS & EXPORTS, MINISTRY OF COMMERCE, THE PEOPLE'S REPUBLIC OF CHINA,**
*Plaintiff,*

**v.**

**UNITED STATES,**
*Defendant-Appellee,*

**AND**

**NASHVILLE WIRE PRODUCTS, INC. AND SSW HOLDING COMPANY, INC.,**
*Defendants-Appellees.*

—————————

2013-1404

—————————

Appeal from the United States Court of International Trade in No. 09-CV-0422, Senior Judge Nicholas Tsoucalas.

—————————

O'MALLEY, *Circuit Judge*, concurring in the result.

I concur in the result the majority reaches today, but not with the entirety of its rationale therefor. I agree with the analysis in Section II of the Discussion section of the majority opinion. That is, I agree that, assuming the *Ex Post Facto* Clause of the U.S. Constitution is implicated by passage of § 1(b) of Pub. L. No. 112-99, 126 Stat. 265 (2012) (the "Act"), the legal consequences imposed on the activities identified therein are not sufficiently punitive to violate the *Ex Post Facto* Clause. I do not agree, however, that the *Ex Post Facto* Clause is necessarily implicated by the Act. And, I disagree that any binding precedent of this court forces us to conclude that it is. For these reasons, I write separately.

I believe we should either conclude that, assuming the *Ex Post Facto* Clause is implicated, it has not been violated by passage of the Act or should decide as a panel whether the Act was actually restorative, doing so anew. The government argues that the *Ex Post Facto* Clause was not implicated by passage of the Act because the Act did not have the effect of attaching "new legal consequences to events completed before [the statute's] enactment." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 266, 269–70 (1994). It asserts that, because the Act did no more than reaffirm the state of the law prior to the Act (i.e., that Commerce always had the authority to impose countervailing duties upon goods imported from non-market economy countries in those instances where it was able to identify a net countervailable subsidy), we need not determine whether § 1(b) is remedial or punitive in nature. While the government concedes that we held in *GPX International Tire Corp. v. United States*, 666 F.3d 732 (Fed. Cir. 2011) ("*GPX I*"), that Commerce did *not* have the authority to impose countervailing duties on such countries, including China, as of the date *GPX I* was decided, the government argues that our decision was mistaken and that Congress has now made that fact clear.

As we conceded in *GPX International Tire Corp. v. United States*, 678 F.3d 1308 (Fed. Cir. 2012) ("*GPX II*"), Congress passed the Act to prevent our decision in *GPX I*, from becoming law, and did so because it believed *GPX I* did not accurately describe the state of the law at the time it was issued. As we noted:

> Having reviewed the briefs submitted by the parties, two things are clear from the new legislation. First, Congress clearly sought to overrule our decision in *GPX* [*I*]. The language of section 1(b) is clear in this respect. Moreover, during the floor debate, our decision in *GPX* [*I*] was referenced by name and discussed at length. One of the bill's sponsors specifically noted that the new legislation "overturns an erroneous decision by the Federal circuit [sic] that the Department of Commerce does not have the authority to apply these countervailing duty rules to nonmarket economies." 158 Cong. Rec. H1167 (daily ed. Mar. 6, 2012) (statement of Rep. Dave Camp).

*GPX II*, 678 F.3d at 1311. We also observed that the new legislation makes clear "that Commerce's imposition of both countervailing duties and antidumping duties on NME countries under 'pre-existing law'" (i.e., the law in place before *GPX I* issued) did not amount to "'unreasonable' double counting." *Id.* at 1312 n.3. Finally, we found in *GPX II* that Congress had the authority to prevent this Court's decision in *GPX I* from becoming a final judgment. *Id.* at 1312. Indeed, we acknowledged that the Act prevented issuance of a mandate that would have put into effect this Court's then-belief that, under pre-existing law, Congress did not intend to allow Commerce to impose both countervailing and anti-dumping duties on non-market economy countries, including China. *Id.* And, no such mandate ever issued.

Because Congress could and did prevent *GPX I* from ever becoming a final judgment, I cannot agree with the majority that *GPX I* "still stands as a statement of the law at the time of its decision." Maj. Op. at 14. *Id.* *GPX I* never became a judgment of this Court and should not be treated as if it did. The fact that we did not vacate the opinion does not give that opinion the force of law or make it precedential.

Because *GPX I* never became law, the only way the *Ex Post Facto* Clause could be implicated is if we were to decide today, as a newly constituted panel, that the holding in *GPX I* was correct—i.e., that Commerce did not have the authority to impose countervailing duties on non-market economy countries prior to passage of the Act.

While the decision in *GPX I* contained many persuasive arguments, it remains true that the exercise the panel there undertook was to determine whether Congress intended to exclude non-market economy countries from 19 U.S.C. § 1671 Section 1671 provides, *without express exception*, that, when a "government of a country" is providing a "countervailable subsidy" with respect to the production or exportation of specific merchandise, "there shall be imposed upon such merchandise a countervailing duty, in addition to any other duty imposed, equal to the amount of the net countervailable subsidy." This unqualified language in the Tariff Act on its face appears to require Commerce to impose countervailing duties on all merchandise for which it identifies a countervailable benefit, regardless of the country of origin. The issue in *GPX I* was whether this language not only permitted Commerce to refrain from imposing countervailing duties where evidence of a subsidy was lacking— as we found in *Georgetown Steel Corp. v. United States*, 801 F.2d 1308 (Fed. Cir. 1986)—but actually *prohibited* Commerce from imposing countervailing duties where non-market economy countries were the ones supplying the otherwise countervailable subsidy.

While *GPX I* had, as noted, a variety of thoughtful rationales to support reading an unexpressed prohibition into the Tariff Act, Commerce is correct that, even at that time, there also were thoughtful arguments that counseled against that conclusion. Not the least of these arguments were the seemingly unequivocal language of the Tariff Act itself, and the fact that Commerce had been exercising what it viewed as its authority under the Act for many years, with Congress specifically allocating funds to Commerce to "defend" against both "antidumping and countervailing duty measures with respect to products of the People's Republic of China," a non-market economy country. 22 U.S.C. § 6943(a)(1); *see also* Consolidated Appropriations Act, 2010, Pub. L. No. 111–117, 123 Stat. 3034, 3113 (2009) (appropriating funds to the China Countervailing Duty Group at Commerce for fiscal year 2010). In addition, as the government argues, not only was there fair room for debate about whether Commerce was prohibited from imposing countervailing duties on China and other non-market economy countries at the time *GPX I* was decided, the landscape has evolved since then.

We now have a clear indication of whether Congress itself believes the Tariff Act meant something other than what it said on its face, and contained the implied prohibition the appellant urges here, and previously urged in *GPX I*. While not binding on us, we now know that Congress believes we misread its earlier silence when we decided *GPX I*.

As the United States points out in its brief: (1) Congress acted quickly to prevent *GPX I* from becoming a final judgment and, thus, having any force of law; (2) Congress changed the language of the statute to make clear that Commerce may—indeed must—impose countervailing duties unless countervailable subsidies are not discernible in a given non-market economy country (the circumstances at issue in *Georgetown Steel Corp.*); (3) the

bill received almost unanimous support, despite its rapid pace; (4) those members of Congress who spoke on the floor about the bill emphasized that its purpose was to prevent *GPX I* from *stripping* Commerce of its ability to impose countervailing duties on non-market economy countries and to "reaffirm" that the countervailing duty laws apply to subsidies from China and other non-market economy countries; and (5) the legislative history is replete with references to legislators' beliefs that our decision in *GPX I* was "based on a deeply flawed assessment of Congressional intent." All of these facts indicate Congress's belief that the Act was intended simply to reaffirm Commerce's authority, an authority Congress believes "Commerce has always had" and believes Commerce should "continue to have and exercise . . . in the future." 158 Cong. Rec. H1166–67 (daily ed. March 6, 2012). This evidence is a congressional signal of what it believes its prior enactment authorized. I believe this expression of congressional intent should be considered when we determine whether—as the United States urges—the Act did not change the law; but merely confirmed it. Whatever the merits of the rationale employed in *GPX I* when it was originally decided, in light of all of the additional information available to us we may well not reach the same result today that the panel did in *GPX I*.

Because I believe the Act may not have changed the law and may only expose appellant to the same legal consequences it faced before passage of the Act, the *Ex Post Facto* Clause may not even come into play. I would either avoid this question, since it is not necessary to resolve the constitutional challenge before us, or address it directly and anew, in light of the entire and updated congressional record.